UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the Matter of

AMY ARUNDELL, and A BETTER CONTRACT
SLATE,

     Plaintiffs,

   -against-

 UNITED FEDERATION OF TEACHERS,

     Defendant.

No.: 1:25-cv-03382-VSB

## <u>MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'</u>
## <u>ORDER TO SHOW CAUSE SEEKING INJUNCTIVE RELIEF</u>

By: STEPTOE LLP
   1114 Avenue of the Americas
   New York, NY 10036
   (212) 506-3900
   aklinger@steptoe.com
   dkolker@steptoe.com
   Alan M. Klinger
   Dina Kolker

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................... 1

BACKGROUND .............................................................................................................. 4

    A.    The 2025 UFT Election ....................................................................................... 4

    B.    Issues Of Importance To Retired Members ............................................................ 6

    C.    Mr. Mulgrew's Visit ........................................................................................... 8

    D.    ABC's Threat To Sue ........................................................................................... 9

ARGUMENT .................................................................................................................. 10

    A.    The April 16 Email Is Not Campaign Literature ................................................. 10

        1.    Content ....................................................................................................... 12

        2.    Tone ........................................................................................................... 17

        3.    Timing ....................................................................................................... 18

        4.    Overall Context .......................................................................................... 19

    B.    Plaintiffs' Second Claim Has Not Been Properly Raised To The UFT ................. 20

    C.    Plaintiffs Have Not Followed UFT's Administrative Process For Election Complaints ....................................................................................................... 22

    D.    Delaying Ballots Is Unjustified And Unneccessary ............................................ 24

CONCLUSION ............................................................................................................... 27

WORD COUNT CERTIFICATION ............................................................................... 28

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Brock v. Metropolitan Dist. Council of Carpenters*,
  797 F.2d 140 (3rd Cir. 1986) ...................................................................................................1

*Cacchillo v. Insmed, Inc.*,
  638 F.3d 401 (2d Cir. 2011)....................................................................................................10

*Calhoon v. Harvey*,
  379 U.S. 134 (1964)...........................................................................................................22, 23

*Clear Channel Outdoor, Inc. v. City of New York*,
  608 F. Supp. 2d 477 (S.D.N.Y. 2009)....................................................................................10

*Cox v. Via*,
  No. CIV. A. 95–3160, 1995 WL 604604 (E.D.Pa. Oct. 12, 1995)...................................17, 18

*Dimondstein v. Am. Postal Workers Union*,
  964 F. Supp. 2d 37 (D.D.C. 2013)..........................................................................................20

*Dole v. Fed. of Postal Police Officers Inc.*,
  744 F. Supp. 413 (E.D.N.Y. 1990) ....................................................................................11, 17

*Donovan v. National Alliance of Postal and Federal Employees*,
  566 F. Supp. 529 (D.D.C. 1983) .............................................................................................17

*Guzman v. Local 32BJ*,
  No. 95 Civ. 5713 (LMM), 1995 WL 562187 (S.D.N.Y. Sept. 21, 1995).........................16, 17

*Huff v. In'l Union of Sec. Officers*,
  165 F.3d 915 (9th Cir. 1998) ...................................................................................................20

*McLaughlin v. American Fed. of Musicians*,
  700 F. Supp. 726 (S.D.N.Y. 1988) .....................................................................................11, 17

*Metzler v. Local 132*,
  Civil Action No. 2:96-0227, 1997 WL 155404 (S.D.W.Va. Mar. 28, 1997) ..............12, 13, 14

*New Directions v. Seda*,
  867 F. Supp. 242 (S.D.N.Y. 1994) .................................................................................16, 17, 24

*New Watch-Dog Committee v. New York City Taxi Drivers Union*,
  438 F. Supp. 1242 (S.D.N.Y. 1977)........................................................................................12

*Smith v. New York Metro Area Postal Union,*
No. 12 Civ.2002(PAC), 2012 WL 1027066 (S.D.N.Y. Mar. 27, 2012) ..................................13

**Statutes**

29 C.F.R. §452.75 ..........................................................................................................11

29 C.F.R. §452.99 ............................................................................................................4

29 U.S.C. §481(c) ..........................................................................................10, 11, 20, 22

29 U.S.C. §481(g) ..........................................................................................................11

New York City Administrative Code, § 13-507, *et seq.* ................................................7

**Other Authorities**

Claudia Irrizary Aponte, *Teachers' Union Withdraws Its Support for Medicare
Advantage Pact, Following Retiree Election Upset*, The City (June 24, 2024),
https://www.thecity.nyc/2024/06/24/medicare-advantage-uft-retirees-
mulgrew/ ....................................................................................................................7

*Cut NYC's Pension Obligations*, Work-Bites (Mar. 26, 2025), https://www.work-
bites.com/view- all/ibu1lwfn2dm9755i9yvwyx918nlban ..........................................7

*Electing Local Union Officers by Mail, DOL OLMS*,
https://www.dol.gov/agencies/olms/compliance-assistance/elections/mail (last
visited: Apr. 28, 2025 ..............................................................................................25

Joe Maniscalco, *New Support for NYC Council Bill Protecting Retirees' Medicare
Benefits*, N.Y.C. Organization of Public Sector Retirees (Feb. 25, 2025)
https://www.nycretirees.org/post/new-support-for-nyc-council-bill-protecting-
retirees-medicare-benefits ..........................................................................................7

Joe Maniscalco, *Pressure on Hochul to Back Off on New Scheme to Cut NYC's
Pension Obligations*, Work-Bites (Mar. 26, 2025), https://www.work-
bites.com/view- all/ibu1lwfn2dm9755i9yvwyx918nlban (citing videos posted
on NYCOPSR's YouTube account ..........................................................................7

*Mail*, DOL OLMS,
https://www.dol.gov/agencies/olms/compliance-assistance/elections/mail (last
visited: Apr. 28, 2025) ..............................................................................................25

*Meet the Board, N.Y.C. Organization of Public Sector Retirees*,
https://www.nycretirees.org/meet-the-board (last visited: Apr. 22, 2025) ..............6

*Presentation*,
available at https://www.youtube.com/watch?v=VdwaORGDLAA ..........................7

N.*Y.C. Organization of Public Sector Retirees*,
   https://www.nycretirees.org/meet-the-board (last visited: Apr. 22, 2025) .................................6

*N.Y.C. Organization of Public Service Retirees Inc., YouTube,*
   *https://www.youtube.com/@nycretirees* ...............................................................................19

## PRELIMINARY STATEMENT

Plaintiffs in this case urge the Court to hold that a union may not communicate with its members on substantive issues of current import simply because these same issues have also been made "campaign issues" by a competing slate of candidates. Plaintiffs' view of the law would prohibit any union from speaking directly to members on such issues—even when members raise questions about them—for an unspecified period around an internal union election. But an election is not a "gag order." The law does not permit opposition candidates to muzzle incumbents from conducting the business of the union just because it has become an election issue.

Here, the challenged email from United Federation of Teachers ("UFT") President Michael Mulgrew to a subset of UFT members—specifically retirees—does not constitute campaigning. As set forth herein, the "April 16 Email" is, on its face, responding to UFT retiree member questions and comments received while on a trip to visit with groups of retirees in Florida. The topics addressed are not only of current and obvious import to retiree members but are topics on which members have expressed interest and UFT, specifically President Mulgrew, has spoken on and engaged with for years. They are also topics of particular interest to outside—*i.e.*, non-UFT— groups that have long attacked UFT (and other City unions) in the press, on social media, and through litigation with the City of New York. That Plaintiffs Amy Arundell and the A Better Contract ("ABC") slate may support or agree with these outside groups does not prevent union officers from continuing to address these issues and related misinformation to members.

Plaintiffs' application seeking to require UFT to send an ABC campaign email for free to "make up" for the April 16 Email is baseless. It is hornbook law that "[d]uly elected union officials have a right and a responsibility to exercise the powers of their office and to report to the membership on issues of general concern" even amid an election campaign. *Brock v. Metropolitan*

1

*Dist. Council of Carpenters*, 797 F.2d 140, 145 (3rd Cir. 1986) (internal quotations & citations omitted).

None of the factors considered by the courts or the U.S. Department of Labor ("DOL") in reviewing whether a union's communications cross the line into electioneering—timing, content, tone, and overall context—weigh in favor of a finding that the Labor Management Reporting and Disclosure Act ("LMRDA") was violated. The content of the April 16 Email discusses issues of clear importance to UFT's retired members and does not mention the election or any candidate for union office. The email's tone further weighs against finding a violation, as there are no attacks on Plaintiffs or any other indicia of an electioneering tone. The email's timing, although during an election period, is not itself determinative. Finally, its overall context weighs against finding a violation, as the topics of the email have been longstanding issues of member concern.

Further, while Plaintiffs do not need to exhaust administrative remedies on this application, there has been no delay on the part of UFT. First, on both claims, Plaintiffs have declined to follow the duly-adopted administrative process for election complaints. Despite this and in the interest of expeditiously resolving the issue, UFT opted to treat Plaintiffs' threat of legal action on the first claim as an election complaint and had been working on the investigation and proposed report and recommendation to the UFT Executive Board when the instant case was filed. This case was filed one week after Plaintiffs complained about the email and amid an unsuccessful parallel litigation by Plaintiffs on another election complaint before the New York County Supreme Court –these same Plaintiffs attempted to prevent the members from having expanded in-person voting opportunities—which was dismissed after hearing the same day this case was filed.[1]

---

[1] *See* Declaration of Carl Cambria ("Cambria Decl."), ¶11, Ex. D (Cohen, J. Decision).

No complaint or even request was previously made by Plaintiffs in connection with their second claim. Although framed as a form of alternative relief in their papers, the second claim—that UFT failed timely respond to a request for supplemental email—is distinct from the first claim. UFT first became aware of this asserted separate request upon reading the instant Complaint. The next indication was Plaintiffs' counsel forwarding this Order to Show Cause and stating that Plaintiff Arundell had separately filed a request with UFT the day prior. UFT has no record of such request and so advised Plaintiffs' counsel. The UFT Election Guide and other election documents provide candidates eight separate opportunities to send or link campaign material to all members at UFT's cost—two print publications, two emails and four text message blasts. Plaintiffs have already participated in the first print publication and first email. The remainder are scheduled to occur during May. The UFT Election Guide also explicitly provides that additional requests at the candidate's cost may be made to the Election Coordinator and will be considered based on listed factors. Plaintiffs have not availed themselves of that process, and in the absence of any detail about Plaintiffs' desired mailing, UFT cannot begin to assess Plaintiffs' request. Accordingly, the second claim is baseless.

Finally, Plaintiffs have no basis for seeking their requested relief, and certainly should not be allowed to delay the UFT election—not among their requested relief—based on such claims. Delay is unjustified and would result in UFT violating the timeline for election in its Constitution. Moreover, it is also unnecessary. As Plaintiffs themselves focus on, the important timeframe is not the day on which the United State Postal Service ("USPS") picks up the ballots, it is when ballots might reasonable be received and voted. Should the Court determine at the hearing that a responsive email is due—which UFT believes unwarranted—UFT would be able to send an email on Monday, May 5 before members have a chance of receiving the ballots, let alone voting and

returning them. Finally, as set out in Section D, *infra*, any meaningful delay in the mailing of ballots would impair the balloting timeline, improperly compressing the time for members to seek replacement ballots or cast and return their ballots in time to be received by the deadline. As such, the UFT requests that the Court deny the application for preliminary injunction and permit the ballots to be mailed as scheduled.

**BACKGROUND**

A.      **<u>2025 UFT Election</u>**

UFT officers are elected every three years. (*See* Cambria Decl., ¶3, Ex. A ("UFT Constitution"), Art. IV, §§1-7.) Elections for other leadership positions (e.g., UFT Executive Board) are held at the same time. (*Id*., Art. V, §4.) Simultaneously, UFT elects delegates to its various affiliated bodies such as the American Federation of Teachers. (*Id.,* ¶3)

UFT elections are a massive undertaking. During the 2022 election, 193,516 ballots were mailed to UFT members by the American Arbitration Association ("AAA"), UFT's then-election administrator. (*Id.,* ¶8-9) Approximately 50,000 were timely received, with some number cast in person at AAA's offices. (*Id.,* ¶9) This year, ballots will be mailed to 201,931 members by UFT's new election administrator, Global Election Services ("GES"). (*Id.*). Additionally, UFT ballots themselves are voluminous and complex, asking members to vote for 959 positions. (*Id.,* ¶10) Implementing changes to the ballot or the voting process takes time, resources and considerable effort. (*Id.,* ¶27)

Further, federal regulations require 15-days' notice of the method and manner of the election to every member, *see* 29 C.F.R. §452.99, and the UFT Constitution requires that ballots be counted by the end of June and the result announced July 1, 2025, at the latest. (UFT Constitution, Art. IV, §2) Similarly, Article IV, § 2 of the UFT Constitution requires that elections be held within 45 days after the closing of nominations. Nominations closed March 17, 2025,

4

meaning that May 1, 2025 is the last day to mail ballots. (*Id.*) As detailed in Section D of the Argument, *infra*, each of these requirements, as well as the necessary logistics and interactions with the USPS, mean that virtually any delay in this closely calibrated process would result in a violation of the UFT Constitution or burden members' ability to vote by shortening various timelines. (*See discussion infra* at Section D; Cambria Decl. ¶26.)

Per the UFT Constitution, elections are overseen by the Executive Board which delegates the authority to run the election to The Election Committee. (Cambria Decl. ¶5) This year's committee (as in the past) contains members affiliated with each of the three slates vying in the election. (*Id.*, ¶6) Pursuant to the Election Notice and supplemental notice sent in UFT publications, ballots are to be mailed on May 1, 2025, are to be received by the outside independent election administrator, GES, by 9:00 am May 28, 2025, and to be counted the following day on May 29, 2025. (*Id.*, Ex. C, I)

The UFT Election Guide provides four opportunities—two emails and two print ads in the *New York Teacher*—for slates to communicate with members at the UFT's expense. Each slate is provided up to two full-facing pages of space. *See* Cambria Decl., Ex. B, ("Election Guide") Art. IX.I. For email communications, the Election Guide provides that, candidates/slates may receive the opportunity "to have their campaign information included in two emails sent to all members containing materials from all candidates/slates providing information[,]" at UFT's expense. *See* Election Guide Art. IX.J. One of these emails was sent April 23, 2025. (Cambria Decl., Ex. G). Although not mentioned in the Guide, the UFT also provided for text message blasts to members with links to campaign content. The Election Committee adopted a schedule of four such text messages at its April meeting. (*Id.*, ¶14, Ex. F).

For email communications outside of those provided for free:

> Any other requested email communications will be assessed and, if feasible, will require the candidate seeking the additional communication to pay the reasonable cost of the communication. Feasibility will depend, in part, on the frequency of the requested communication, the scope of recipients and the timing of the request, including in relation to other important election and union communications. Whenever possible, the cost will be divided among all those candidates/slates seeking to participate. Requests should be made to the Election Coordinator.

Election Guide Art. IX. J.[2]

### B.    Issues Of Importance To Retired Members

While there are many issues of interest to the UFT's members, the three issues raised in the April 16 Email have been topics of keen interest for years, particularly for retirees: (1) the UFT's stance towards Medicare Advantage/traditional Medicare; (2) related legislation—repeatedly introduced at the City Council, currently as Bill 1096—seeking to freeze retiree healthcare; and (3) Governor Kathy Hochul's more recent proposed bill to effect "pension smoothing" for several city pension systems, including the NYC Teachers Retirement System ("TRSNYC").

The issue of Medicare Advantage and negotiations around retiree health benefits have been subjects of concern to members for years, including since prior to the last UFT election in 2022. Although UFT no longer supports having a Medicare Advantage plan (as reiterated in the Email), concern surrounding the matter has primarily been stoked by the N.Y.C. Organization of Public Service Retirees ("NYCOPSR"), a group of retired public employees whose Board of Directors and Administrative Board contain no UFT retirees, though some UFT retirees may be members.[3] As the June 2024 article cited by Plaintiffs demonstrates, this is not a new issue, UFT has been

---

[2] Election Guide Art. IX.J also contains provisions for requests for postal-mail communications, which are not at issue here.

[3] *See Meet the Board*, N.Y.C. Organization of Public Sector Retirees, https://www.nycretirees.org/meet-the-board (last visited: Apr. 22, 2025).

involved in these issues of public debate for years, with Mr. Mulgrew periodically making public statements or communicating to membership on the subject. *See* Claudia Irrizary Aponte, *Teachers' Union Withdraws Its Support for Medicare Advantage Pact, Following Retiree Election Upset*, The City (June 24, 2024), https://www.thecity.nyc/2024/06/24/medicare-advantage-uft-retirees-mulgrew/.

Similarly, Bill 1096, and the UFT's opposition to it and its predecessor bills, is not new. NYCOPSR is a driving force behind Bill 1096 and other similar legislation. *See* Joe Maniscalco, *New Support for NYC Council Bill Protecting Retirees' Medicare Benefits*, N.Y.C. Organization of Public Sector Retirees (Feb. 25, 2025) https://www.nycretirees.org/post/new-support-for-nyc-council-bill-protecting-retirees-medicare-benefits. NYCOPSR has spread what UFT believes is misinformation concerning the bill, causing anxiety and frustration among UFT retired members.

Finally, while "pension smoothing" is somewhat newer, NYCOPSR has taken a public stance against it and linked it directly to the two prior issues, including making statements rife with inaccuracies. *See* Joe Maniscalco, *Pressure on Hochul to Back Off on New Scheme to Cut NYC's Pension Obligations*, Work-Bites (Mar. 26, 2025), https://www.work-bites.com/view-all/ibu1lwfn2dm9755i9yvwyx918nlban (citing videos posted on NYCOPSR's YouTube account). For this reason, the UFT invited Victoria Lee, in her role as a teacher-member of the TRSNYC Board of Trustees, to make a presentation explaining the smoothing bill at the March 19, 2025 UFT Delegate Assembly and linked in the April 16 Email.[4]

---

[4] A copy of the presentation is available at https://www.youtube.com/watch?v=VdwaORGDLAA. A copy of the presentation was also disseminated to UFT Delegates by email and later linked in the April 16 Email. TRSNYC is one of five public employee pension systems established under state law. Teacher members of the Board of Trustees are elected by all contributors—including but not limited to UFT members—in separate elections run by the New York City Department of Education, not the UFT. *See* New York City Administrative Code, § 13-507, *et seq.*

### C. **Mr. Mulgrew's Visit**

The UFT President—and other representatives—often travel to meet UFT active members and retirees in person. This includes both visits to DOE schools and travel to areas where significant groups of retirees reside, such as parts of Florida. (*See* Declaration of Victoria Lee ("Lee Decl."), ¶5) In fact, the UFT maintains a Retiree Center in Florida where retirees can receive services, ask questions and participate in other activities. (*Id*., ¶10.). These visits involve both presentations about the happenings in the Union, and an opportunity for retirees to speak directly to elected representatives. (*Id.*, ¶5) Apart from during the COVID pandemic, when meetings were largely virtual, Mr. Mulgrew typically visits retirees each year. (*Id*., ¶8.)

Most recently, Mr. Mulgrew, Ms. Lee, and others visited retirees in Florida on March 25 and 26, 2025. (*See* Lee Decl., ¶9.) During this visit, Mr. Mulgrew met with some 300 retiree members (in two meetings) and was asked questions and received comments on all of the three topics discussed *supra*. (Id., ¶10-12) Mr. Mulgrew and other UFT elected representatives are frequently asked about the issues raised by these Florida retiree members, and asked to respond to what the UFT believes is inaccurate information about retiree health and pension benefits spread by outside organizations. (*See Id.*, ¶12.) While the UFT, and others, had previously addressed some of the most recent misinformation, it was clear that questions and/or misconceptions remained. (*Id.*, ¶14, Ex. 1 (NYC Actuary FAQ))

As expressly stated in the April 16 Email, it was sent as a follow-up to the trip and addressed issues raised in those conversations. Contrary to Plaintiffs' allegations, the email was not sent to all 200,000 members. Because it was a follow-up to meetings with retirees, it was sent solely to retirees—48,644 recipients, of which 46,175 were delivered and 29,578 were opened. (*See* Lee Decl., ¶15.) The UFT periodically sends these types of follow-up emails addressed from Mr. Mulgrew or others when important information needs to be communicated.

**D.     ABC's Threat To Sue**

On April 16, 2025, amid briefing on a separate challenge by Plaintiffs in state court, the UFT received an email from Plaintiffs' counsel forwarding the April 16 Email and stating:

> Alan and Dina and Beth:
>
> This email was a big mistake by Mike.
> Amy demands the right to do a similar email with a video.
> The two attached cases, both of which involved distributions six months before the election resulted in my clients getting a free mailing. The 32B one didn't mention opponenets.
> To send this out 14 days before the ballots is blantantly illegal.
> Do you want to litigate this too, or just concede.
>
> *Arthur Z. Schwartz*
> **Principal Attorney Advocates for Justice Chartered Attorneys**

(Cambria Decl., Ex. H). Plaintiffs' counsel did not, however, communicate any request that, in the absence of a finding that the April 16 Email constituted electioneering, Plaintiffs be allowed to send a campaign email at her expense. UFT counsel responded that despite Plaintiffs again ignoring the UFT's election complaints process (*see infra* Section C), UFT would treat the issue as a complaint, investigate, and issue a report and recommendation to the UFT Executive Board as soon as practicable.

Concurrently, on April 14, Plaintiffs moved by order to show cause in state court to enjoin the UFT election from proceeding unless the UFT's plan for expanded in-person voting in addition to universal mail ballots was canceled. UFT filed its opposition on April 17, ahead of the holiday weekend. On April 24, after hearing argument, New York County Supreme Court denied Plaintiffs' application and dismissed their suit. (Cambria Decl., ¶11, Ex. D.) Due to both this parallel litigation and the ongoing investigation of this complaint, a report and recommendation was in process but not finalized by April 24, 2025.

On April 24, Plaintiffs filed suit. This was the first notice UFT received of Plaintiffs' request to send a campaign email *at Plaintiffs' expense*.

**ARGUMENT**

Plaintiffs both fail to show that the April 16 Email constitutes campaign literature under 29 U.S.C. §481(c) and that they are otherwise entitled to relief on their second claim. They are not entitled to a preliminary injunction.[5] Moreover, delaying the mailing of ballots is unwarranted and unnecessary. Plaintiffs themselves focus on when ballots will be received rather than when they are picked up by USPS. Should the Court find that Plaintiffs are entitled to a union-paid email (which the UFT disputes), that remedy can be accommodated during that period with the Court's direction setting the parameters of any such email. Regarding timing for the second claim asserting a request that an email be sent at Plaintiffs' expense, there is no requirement that it be complied with before ballots are mailed. To be clear, the UFT will respond to and process such request on a priority basis, but there is no law or rule entitling Plaintiffs to have an email sent out prior to the ballots such that ballots could be lawfully delayed.

**A.      The April 16 Email Is Not Campaign Literature**

LMRDA, §481(c) provides that *if* a union distributes campaign literature on behalf of any candidate, it must do so for every candidate under the same conditions. *See* 29 U.S.C. §481(c). Similarly, §401(g) provides

> No moneys received by any labor organization by way of dues, assessment or similar levy, and no moneys of an employer shall be contributed or applied to promote the candidacy of any person in an election subject to the provisions of this subchapter. Such moneys of a labor organization may be utilized for notices, factual

---

[5] The UFT agrees that the traditional analysis for a preliminary injunction—likelihood of success on the merits, irreparable harm, and the balance of equities—applies. *See Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 405–406 (2d Cir. 2011). Importantly, the party seeking relief "must show a clear or substantial likelihood of success where the injunction sought is mandatory—*i.e.*, it will alter, rather than maintain, the status quo." *Clear Channel Outdoor, Inc. v. City of New York*, 608 F. Supp. 2d 477, 482 (S.D.N.Y. 2009) (internal quotations omitted). This is the case here, as Plaintiffs seek to require UFT to take action. However, as UFT believes that this case rises and falls on Plaintiffs' likelihood of success, UFT's briefing focuses on that point.

statements of issues not involving candidates, and other expenses necessary for the holding of an election.

29 U.S.C. §481(g). The DOL interpretive regulation implementing this provision of the LMRDA provides that it prohibits a union to show preference, advanced through use of union resources, "to criticize or praise any candidate." It may not "attack a candidate in a union-financed publication nor urge the nomination or election of a candidate in a union-financed letter to the members." 29 C.F.R. §452.75.

In evaluating whether a union-financed publication violates §481(g) (and by extension §481(c) if no equal opportunity is given for other caucuses), courts consider the tone, content, timing, and context of the publication. *See Dole v. Fed. of Postal Police Officers Inc.*, 744 F. Supp. 413, 418 (E.D.N.Y. 1990) (internal citations omitted); *McLaughlin v. American Fed. of Musicians*, 700 F. Supp. 726, 734 (S.D.N.Y. 1988). The DOL's Office of Labor-Management Standards (OLMS), which administers LMRDA regulations, follows the same standard.

Plaintiffs argue that the April 16 Email constitutes campaigning because "two weeks before the ballots were set to go out, Mulgrew writes about the two hot-button issues in this election: pensions and the attempt by Mulgrew and the City to force all UFT retirees (who are voters) onto Medicare Advantage coverage," and that the April 16 Email was allegedly "without question" a response to a blog post by a UFT member who supports Plaintiffs made months prior. Pl's Br. (ECF Dkt. #6) at Section II.

Plaintiffs' argument is without merit. Relevant precedent demonstrates that the content, timing, tone, and context of the April 16 Email lack the indicia of electioneering. Rather, the Email far more clearly fits the mold of a valid communication to members about a topic of critical interest.

11

### 1. **Content**

The April 16 Email is not laudatory of any incumbent candidate, nor is it derogatory of any opposition candidate. There is no mention of Plaintiffs, nor is there any mention of any other union members in their capacity as candidates. In fact, there is no mention of the election. While Plaintiffs argue otherwise, nothing in the LMRDA prohibits UFT from continuing its work during the election. Just because a slate makes a particular issue a campaign issue does not mean the Union can no longer speak of it through official channels: such policy would be both contrary to law and unworkable as a practical matter of union governance.

It is well-established that while incumbents must not engage in electioneering in official communications, courts recognize that "even in the midst of a heated union election, incumbent officials must carry on business." *Metzler v. Local 132*, Civil Action No. 2:96-0227, 1997 WL 155404, at *5 (S.D.W.Va. Mar. 28, 1997) (internal citations omitted). The content of a communication only weighs against the union where it contains statements or opinions that could reasonably be interpreted as electioneering, such as "severe criticism of opposing candidates or lavish campaign promises[.]" *New Watch-Dog Committee v. New York City Taxi Drivers Union*, 438 F. Supp. 1242, 1251 (S.D.N.Y. 1977).

Communications relaying facts and the union's position on a hot-button issue without mentioning the election are regularly found not to violate the LMRDA. *Local 132* is instructive. There, an opposition slate advocated increasing retirees' pension benefits, including sending a letter guaranteeing that if elected they would give retired members a pension cost-of-living increase. This campaign sparked inquiries by retirees to the union's elected pension trustees, who responded with a speech by one trustee to a regular meeting of the local and a mass-mailed letter to retirees (along with their pension checks) responding directly to the opposition slate's letter,

both arguing that the pension fund could not afford such an increase. 1997 WL 155404, at \*2-4. The court held that neither the speech nor letter constituted campaigning, as neither mentioned the election and both were rooted in a discussion of facts about the pension fund. *Id*., at \*5-7. In disagreeing with the Secretary of Labor's decision to charge the matter, the court held that:

> The Secretary seems to offer an incumbent trustee two unpalatable options when opposing candidates make factually unsupported promises relating to a fund: (1) either sit silent while the anxious retirees respond to empty promises; or (2) expend his own personal campaign money, and use his own stationery, to correct irresponsible assertions. The Court does not read section 481(g) to compel or even encourage such a Hobson's choice.

*Id*., at \*7. Similarly, in *Smith v. New York Metro Area Postal Union*, the Court, rejecting the plaintiff's claim, and identified by their absence the "hallmarks of campaign literature":

> The publication is neither laudatory of the incumbent candidates nor is it derogatory of any opposition candidate. Indeed, there is no mention of Plaintiffs, nor is there any mention of any other union members in their capacity as candidates. There are no pictures of the incumbent candidates, nor is there any discussion of party platforms. Indeed, there is not even any mention of the election date, and no encouragement of going to the polls.

No. 12 Civ.2002(PAC), 2012 WL 1027066, at \*2 (S.D.N.Y. Mar. 27, 2012).

OLMS decisions apply the same standard.[6] *See* OLMS Decision Letter, *IBEW Local 1269*, at \*5-6 (May 12, 2015) (no violation where union's newsletter defended union from accusations of misconduct raised as election issue when there was no mention of election in the at-issue articles); OLMS Decision Letter, *IATSE Local 600*, at \*3 (June 14, 2011) (no violation where the communication took a position on a referendum concerning a corporate dissolution of the union coincident with an officer election, as even though the corporate dissolution was an election issue, the at-issue email did not discuss the officer election or directly criticize the complainants); OLMS

---

[6] For the Court's convenience, pursuant to Rule 4(c) of its Individual Practice Rules, copies of the OLMS decisions are annexed to the brief in an appendix.

Decision Letter, *UFCW Local 555* (Feb. 7, 2020) (no violation where the union's officers used official channels to campaign for legislation endorsed by the union).

The April 16 Email bears none of the hallmarks of campaign literature. Rather than discuss the election, the email from the outset declares that UFT and Mr. Mulgrew are, in the wake of Mr. Mulgrew's Florida visit, writing "to update [members] on some issues that are important to retirees and our union, especially in such a complex time in the world." The email is focused on three substantive issues—Medicare Advantage/traditional Medicare, Bill 1096, and the pension smoothing bill—that were raised to Mr. Mulgrew on the visit and have been topics of keen concern to UFT members. The email provides relevant information on these matters and clarifies UFT's position on these issues for members who may have heard contrary information. Like the court and OLMS decisions discussed above, the April 16 Email had a clear non-election purpose, which weighs against finding a violation.[7]

Plaintiffs' position—that any official discussion of matters that they have taken a campaign position on *ipso facto* constitutes unlawful campaigning—is contrary to well-established precedent. However, the April 16 Email is even further afield. In *Local 132*, the disputed communication concerned the opposition's campaign promises around the pension fund. Similarly, in *IBEW Local 1269*, the communication concerned accusations of misconduct by the union levied by the opposition campaign, while in *IATSE Local 600*, the communication concerned a referendum on the union's continued corporate existence that had become a key election issue in the simultaneous officer elections. In all three cases, even though the issue discussed in the

---

[7] The only reference in the email to any election is to the "retiree election." This is not a reference to either the current or prior officer election. The UFT structure includes elected representatives – Chapter Leaders – elected locally in smaller subgroups, called chapters. A school would be a chapter and elect its own Chapter Leader, analogous to a shop steward. The Retiree Chapter likewise elects a Chapter Leader, most recently in 2024, where Medicare policy was a significant issue. The email references this election as an expression of member views, which Mr. Mulgrew "heard loud and clear." There is no reference to candidates or caucuses or any other campaign matters. A union president expressing that he has heard the views of his members loud and clear does not constitute campaigning.

disputed communication was specifically raised as an election issue, and was concerned with policy relating to that union alone, the courts and OLMS still found no violation, because officers cannot be muzzled from communicating with members about the business of the union. Here, the substantive issues raised in the April 16 Email are not exclusive to the UFT, but are larger issues of public policy affecting the entire public-sector workforce in New York City. Moreover, they do not originate in any union campaign but arose from the conduct of outside organizations and individuals. As such, they are even further attenuated from the election campaign than those cases where no violation was found, and are thus even further from the line of electioneering.

In addition to what *is* in the email, the April 16 Email also *lacks* any content that could reasonably be interpreted as electioneering. Despite Plaintiffs' claims, there is ***no reference*** ***anywhere*** in the email to Plaintiff Arundell, the ABC caucus, or the election at all. Certainly, it does not reference or respond to Mr. Goldstein's blog post from nearly two months prior. Pl's Br., Section II. Rather, the email is responding to questions about three issues of import to retired members and is critical of the individuals alleged to be spreading misinformation. They are described in the email's final paragraph as "outside influences who are not members of the UFT and have never been connected to our union." This criticized group cannot reasonably be interpreted as a reference to any UFT caucus. UFT caucuses like ABC, Unity, and ARISE are, by definition, groups of current UFT members connected to UFT. Tying criticism of a group of people "who are not members of the UFT and have never been connected to [the UFT]" to the ABC caucus is illogical. Rather, based on the overall context and history of the three issues discussed, the email implicitly refers to NYCOPSR, whose leadership (as discussed *supra*) is from outside the UFT and UFT believes is a key source of agitation regarding all three issues. That members of

the ABC caucus may agree with the positions of this outside group or support the group does not render criticism of such group improper campaigning.

The cases raised by Plaintiffs are inapposite. In *New Directions v. Seda*, 867 F. Supp. 242 (S.D.N.Y. 1994), the incumbent president of TWU Local 100 published an article in the union newspaper specifically referencing the opposition caucus:

> It is obvious to me that New Directions wants—let me put this a little stronger—is praying for me and my fellow officers to fail in the [ongoing contractual] negotiations so that they have an issue to run on later this year. In other words, New Directions wants you—the rank and file member—to get screwed on this contract so that they can say, "see, we told you so, vote for us."

867 F. Supp. at 243. The incumbent also called the plaintiffs "political opportunists," and counseled them to "wait until the election to electioneer." *Id*. at 245. The Court therefore found that the article was "conspicuously political in nature." *Id*.

Similarly, in *Guzman v. Local 32BJ*, likewise cited by Plaintiffs, the incumbent union leadership distributed a 142-page book entitled "Sixty Years of Progress" to its entire membership at union expense. No. 95 Civ. 5713 (LMM), 1995 WL 562187, at *1-2 (S.D.N.Y. Sept. 21, 1995). The book sharply criticized the plaintiffs, who had challenged the incumbent president in the preceding election, as "disruptive" and "frivolous" for their challenge in the previous election. *Id*. While Plaintiffs argue that the book "didn't mention opponents [sic]," this is untrue. *See id*., at *1 ("The book is also critical of Mr. Bevona's 1992 opponents, the Plaintiffs in the present action"). Moreover, there was no evidence that the book focused on issues of immediate importance to union members—the defendant union itself argued that the book was intended only to "give [members] a fuller understanding of, and pride in, their Union and its history." *Id*.

Conversely, here, there is no criticism (or mention) of the ABC caucus (or any caucus) and no reference to this election or the previous officer's election. Moreover, the content of the communication is directly related to questions and concerns raised by UFT members directly to

the UFT President, and the subject of ongoing public controversy inside and outside UFT. As such, the content of the April 16 Email strongly weighs against finding a violation.

### 2. **Tone**

Much like the content of the email, its tone does not make it a campaign communication. While strident in places, there is none of the lavish praise for incumbents or harsh criticism of identifiable opposition figures that courts have found makes an email's tone violative.

There is no bright-line rule establishing when a communication's tone constitutes electioneering. However, personal attacks on other candidates or caucuses are more likely to constitute electioneering. *See American Fed. of Musicians*, 700 F. Supp. at 734-35 (challenged communications "crossed the line into impermissible electioneering based on the harsh tone of the criticism, the timing, and the references to the upcoming election contained in the articles"). Repeated attacks on a candidate are similarly likely to constitute electioneering. *Fed. of Postal Police Officers*, 744 F. Supp. at 415-16 (personal attacks on the complainant candidate in four issues of the union newspaper). Similarly, lavish praise of an incumbent can constitute electioneering. *See Donovan v. National Alliance of Postal and Federal Employees*, 566 F. Supp. 529 (D.D.C. 1983). However, emotionally charged and even personally critical statements do not necessarily constitute electioneering. *See Cox v. Via*, No. CIV. A. 95–3160, 1995 WL 604604, at *3-4 (E.D.Pa. Oct. 12, 1995).

Plaintiffs' cases, *New Directions v. Seda* and *Guzman v. 32BJ*, are once again wildly inapposite. In *New Directions*, the at-issue communication alleged that the plaintiffs were "praying for [the incumbent] and [his] fellow officers to fail" and wanted rank-and-file members "to get screwed" on the upcoming contract, as well as spoke of the plaintiffs "derisively[,]" calling them "political opportunists[.]" 867 F. Supp. at 243, 245. Similarly, in *Guzman*, a substantial portion of

the book concerned the 13-year period the incumbent had been president. 1995 WL 562187, at *1. The communication lavished praise on the incumbent president, including "[a]n eight page section of the book presents charts and graphs showing how [the incumbent] has outperformed all previous presidents of the union[,]" and sharply criticized the challengers. *Id*., at *1-2.

Conversely, the April 16 Email statements are not connected to criticism of any candidate or caucus and do not reference the election at all. Moreover, particularly given NYCOPSR's persistent attacks on UFT and the amount of anxiety and frustration created by its extended efforts, emphatically phrased opposition is reasonable under the circumstances. Similarly, the April 16 Email does not contain any praise of Mr. Mulgrew or other incumbent officer. To the extent that any statements in the email could be viewed as subtly complimentary, they are directly related to the information provided by the email concerning retiree health and pension benefits, rather than lavish praise beyond what could be expected in a normal description of a union officer's activities. As such, they do not create a violation. *See*, *e.g.*, OLMS Decision Letter, *IBEW Local 46*, at * 2 (Dec. 9, 2014). The tone of the April 16 Email weighs against finding a violation.

### 3.     <u>Timing</u>

Contrary to Plaintiffs assertion, while the April 16 Email was in arguably sent during the election period, that is not dispositive. For example, the OLMS has found no violation where an article was published in the union newsletter the same month as the election and complimented one of the candidates running for office. *IBEW Local 46* at 2; *see also OPCMIA*, at *4 (Dec. 8, 2015) (no violation from Summer 2014 magazine issue article when election on August 12, 2024).

The April 16 Email was sent approximately seven weeks prior to the day of the election on May 29, 2025, and two weeks prior to ballots being mailed, timing that has been found not to constitute a violation in similar cases. Campaign communications sent during the election period

must be otherwise problematic for the timing to matter. As discussed *supra*, the April 16 Email is squarely focused on policy issues raised by UFT members, and lacks any indicia of electioneering. *See OPCMIA*, at *4 (no violation where, in the at-issue article, "[t]he incumbent president made a laudatory statement about each of two candidates on his slate in the overall context of the work those incumbent officers had done over the prior years[,]" as "[t]here was no mention of the election or inclusion of campaign rhetoric").

### 4. Overall Context

The overall context of the April 16 Email also weighs against a violation. For several years, NYCOPSR has spread what UFT views as disinformation concerning UFT's positions and motivations on various issues relating to retiree benefits. NYCOPSR has continued to engage in these attacks on UFT throughout this election season, with frequent videos on this subject posted on its YouTube page. Plaintiffs' submissions confirm this.[8] UFT has historically responded and continues to respond to these attacks, to ensure that members are accurately informed about the business of the union.

That this outside group has continued these attacks during the UFT election season or that some candidates agree with them or support them does not immunize them from response. Imagine that Plaintiffs or other challengers took a position in support of a policy—for instance, a Mayoral proposal to institute merit pay for all public-sector workers, or a state legislative proposal to privatize the pension system—that UFT opposes. Would any statement opposing such a policy now be off limits for official communications because Plaintiffs had raised it as a campaign issue? The law does not provide such limitations on the work of incumbent union officers, nor could it, as such an interpretation would be entirely unworkable as a matter of both policy and law.

---

[8] *See generally N.Y.C. Organization of Public Service Retirees Inc.,* YouTube, https://www.youtube.com/@nycretirees.

Plaintiffs argue that even if the April 16 Email is not campaign literature, it shows that "the UFT communicates by email with its members (with emails even stating their first name), and Plaintiffs have a right [pursuant to 29 U.S.C. § 481(c)] to send out emails to all or part of the membership[.]" Pl's Br., Section II. Plaintiffs argue that "a sufficient request has been made, both by counsel and by Plaintiff Arundell[.]" (*Id.*) Although presented as an alternative remedy for the first claim, this argument asserts a separate and entirely distinct claim, analyzed under a different standard, that the UFT failed to respond to a request to send an email containing ABCs campaign materials. Plaintiffs are certainly entitled to make a reasonable request for an additional email at their expense, they simply had not done so. The UFT will respond to all reasonable requests in an expeditious manner.

Section 481(c) requires unions to honor "all reasonable requests of any candidate to distribute by mail or otherwise at the candidate's expense campaign literature[.]" Whether a request is reasonable depends on whether it would create "(1) any financial hardship suffered by the union, (2) any administrative burden imposed on the union, and (3) any discrimination against other candidates." *Dimondstein v. Am. Postal Workers Union*, 964 F. Supp. 2d 37, 45 (D.D.C. 2013) (citing *Int'l Org. of Masters, Mates & Pilots v. Brown*, 498 U.S. 466, 478 (1991)). Unions must attempt to comply with such requests but are allowed the opportunity to assess their reasonableness and—if reasonable—work to comply. *See Huff v. In'l Union of Sec. Officers*, 165 F.3d 915 (9th Cir. 1998) (a period of three weeks from proper request to compliance was reasonably timely).

The UFT Election Guide and Election Committee arrange for eight separate opportunities for candidates to distribute campaign material to members at the UFT's expense. (Cambria Decl., ¶12.) Should a candidate wish to send additional communications, the Election Guide provides that

> Any other requested email communication will be assessed and, if feasible, will require the candidate seeking the additional communication to pay the reasonable cost of the communication. Feasibility will depend, in part, on the frequency of the requested communication, the scope of the recipients and the timing of the request, including in relation to other important election and union communications. Whenever possible, the cost will be divided among all those candidates/slates seeking to participate. Requests should be made to the Election Coordinator.

(Cambria Decl., ¶16, Election Guide, Sec. XI. J.)

This lawsuit is the first UFT was aware of Plaintiffs' request that an email blast be sent at her expense (and not as a remedy for alleged improper campaigning). (*Id.*, ¶19) No request was received prior to this lawsuit and no election complaint was filed in connection with any alleged failure by the UFT to respond. (*Id.*, ¶18) To the extent Plaintiffs are relying on Mr. Schwartz's email of April 16, 2025, that reliance is flawed.

Mr. Schwartz's April 16 email to UFT General Counsel could not reasonably be read to seek a mailing at his client's expense. It clearly asserts Plaintiffs' view that the April 16 Email constituted illegal campaigning and demands as a remedy that his client be permitted an email in return at no cost. It makes no mention of making any alternative request. Instead, Plaintiffs' demand was for "the right to do a similar email with a video[,]" followed by a reference to cases where Mr. Schwartz's clients "[got] a free mailing[.]" This is inconsistent with a request for a paid-for communication. Nor did Mr. Schwartz clarify the request when UFT General Counsel responded that his complaint would be investigated, clearly indicating that UFT had not understood the email to contain this other request.

Moreover, the Election Guide specifically requires that such requests be made to the Election Coordinator. (Cambria Decl., ¶16) Seemingly recognizing this error, on Friday April 25, 2025, after filing their application for injunctive relief, Plaintiffs' counsel emailed the court papers to UFT's General Counsel and outside counsel asserting that Plaintiff Arundell had, the prior day, sent a separate request to the "Election Committee." (*See* Cambria Decl., ¶20.) UFT reviewed its

records and found no evidence of such request. Outside counsel responded the same day via email that the UFT did not have a record of such a request being made to the Election Coordinator. (*Id.*, ¶20-21.) Thus, Plaintiff was on notice that no request was received, and no such request has since been received.

Should Plaintiffs demand that UFT allow them to send a campaign email through UFT's email communications channels, UFT will consider the factors laid out in the Election Guide to determine on what terms and at what cost such email may be sent—the operation of a communications management system for a membership of some 200,000 people is not as simple as drafting an email and hitting "send" to as many recipients. Accordingly, a general request without further information about its scope and/or frequency and timing cannot be considered in any meaningful way. Should a request be made, UFT will work promptly to comply and will also offer the same opportunity to the other two caucuses running slates, as is required. Accordingly, Plaintiffs' demand for relief from the Court on this claim is premature.

## C. Plaintiffs Have Not Followed UFT's Administrative Process For Election Complaints

The Court has rightly asked for information regarding whether Plaintiffs have exhausted administrative remedies in this matter. While LMRDA claims challenging conduct during a union election are generally required to first exhaust administrative remedies and then appeal to the DOL, Section 481(c) allows "bona fide candidate[s] for office" (which Plaintiff Arundell is) to enforce the rights guaranteed under that section. *See Calhoon v. Harvey*, 379 U.S. 134, 140 n.13 (1964). Accordingly, while the Court may consider Plaintiffs' failure to properly avail themselves of internal procedures, the matters are properly before the Court.

With regard to procedure, Article VIII of the UFT Election Guide provides a detailed process for filing a complaint, including a dedicated online form and a description of the steps in

the process culminating in a determination by the UFT Executive Board. (See Cambria Decl., Ex. B.) Unions generally have "great latitude in resolving their own internal controversies[.]" *Calhoon v. Harvey*, 379 U.S. 134, 140 (1964). There is no established timeline under which pre-election complaints must be resolved.

Plaintiffs did not submit their complaint concerning the April 16 Email through the established process. Instead, Plaintiffs bypassed the procedure applicable to all members and immediately jumped to threats of legal process. (*See* Cambria Decl., ¶18, Ex. H.) This is the second such direct letter threatening to sue received by UFT from Plaintiffs and their counsel. Plaintiffs were advised in response to their first letter (the subject of unsuccessful state litigation) that any complaints needed to be submitted through the election complaint process to be investigated and determined. Still, the instant letter was again received outside that process.

In the interest of time, UFT opted to treat Plaintiffs' threat to sue as an election complaint and began investigation. (Id., ¶18) Due to the parallel state court litigation, this investigation was not yet completed in the one week between receipt of Counsel's email and the commencement of this action (which included the Easter/Passover holiday). UFT has now diverted these efforts to the instant application. However, as discussed herein, UFT's analysis of the complaint concludes that the April 16 Email did not violate the LMRDA. As such, while it would have been appropriate for Plaintiffs to give UFT a chance to complete its internal process, this issue is properly within the Court's purview, and UFT welcomes the Court's consideration.

Regarding Plaintiffs' separate claim that UFT has not responded to their request for a paid campaign mailing, no request has been received and no complaint has been filed, save for this proceeding. As of the afternoon of April 28, no request was received. (Cambria Decl., ¶19-21)

**D.** **Delaying Ballots Is Unjustified And Unnecessary**

As set out herein, Plaintiffs have no likelihood of success on the merits and thus are not entitled to any relief, let alone to delay the mailing of 200,000 ballots. Delay is unjustified.

Delay is also unnecessary. Should the Court determine that a responsive email be sent, which UFT believes would be unwarranted, such email need not delay the ballots. Given the reasonable estimate that all ballots mailed on May 1 should be received by May 8, the period from now through May 8, provides a window during which Plaintiffs' email could be sent. If the Court ordered such an email at the hearing, and content was received in a timely manner, UFT could distribute the email on May 5.[9]

As set forth in detail in the accompanying Declaration of Maralin Falik, CEO of GES, any meaningful delay in mailing ballots would be incredibly burdensome and improperly restrict the time members would have to vote. (*See* Declaration of Maralin Falik ("Falik Decl."), ¶1.)

As a threshold matter, May 1 is the latest date compliant with the UFT Constitution. Article IV, § 2.

As of this filing, all the ballot components have been printed. Assembly is underway and will be completed by May 1. (Falik Decl., ¶8) While the ballots themselves do not reference the mailing date, any change to any date ballots are due or to be counted would require changing the ballots and create considerable delay and expense as obtaining materials for, printing and assembling over 200,000 ballots costs hundreds of thousands of dollars and took several weeks to accomplish. (Id., ¶19; Cambria Decl., ¶27.) Prepared ballots are kept secure until they are picked

---

[9] Should it become necessary, UFT would request guidance from the Court regarding the limited parameters of any such email to expedite the process. *See, e.g., New Directions*, 867 F. Supp. at 245 (prohibiting plaintiffs' communication from referring to the plaintiff caucus' candidate for president and limiting its content "solely to a response to defendant's [violative] May 1994 article).

up from GES's printer by the USPS. These ballots are not simply dropped in a mailbox. They comprise some 337 bags of mail and represent, to GES's knowledge, the largest union election in the tristate area. (Falik Decl., ¶6) Accordingly, this requires advance coordination with USPS. Presently, USPS is scheduled to pick-up the ballots in large postal trucks 3:00 pm on May 1. (*Id.*, ¶8.) After being advised of this Court's Order, on April 28, GES inquired with USPS if that appointment could move to May 2. Upon sufficient notice, USPS agreed. (*Id.* ¶13-14). However, any delay beyond that point would impair the ability of GES and UFT to administer a compliant election that provides members sufficient time to cast their ballots. (*Id.*, ¶15)

The date of mailing impacts directly on the time members will have to seek a replacement ballot if necessary and timely mail their ballots back. All this is complicated by the unpredictability/unreliability of USPS operations, which now provide that First-Class mail is delivered in 1-5 business days (weekends don't count). (*Id.*, ¶16.) As a result, the DOL currently advises that ballots be out at least 3-4 weeks in advance.[10] The current timeline provides members 28 days.

In GES's experience, ballots picked up May 1 will be processed and mailed by the end of May 2 and will begin to be received by members the following week. Per USPS estimates and GES experience, all members can reasonably be expected to receive ballots by May 8. That gives members 20 days to vote their ballots (including time to receive replacement ballots, as needed, and for USPS to deliver a voted ballot to GES). (*Id.*, ¶11.)

Ballots picked up the morning of May 2 still have a chance of being processed on Friday. However, if ballots are picked up later in the day on May 2, they will not be processed and mailed until the following week. (*Id.*, ¶14-15.) GES has previously been advised that large USPS

---

[10] *Electing Local Union Officers by Mail*, DOL OLMS, https://www.dol.gov/agencies/olms/compliance-assistance/elections/mail (last visited: Apr. 28, 2025).

processing facilities do not process mass mailings on weekends. (*Id.*, ¶10) If the ballots are not processed until May 5, they will not begin to be received until late that week and into the following week. All members would likely not receive their ballots until closer to May 12, compressing the period for members to vote to only 16 days. (*Id.*, ¶15.) This is barely what DOL regulations require and is shorter than DOL recommends, keeping in mind that few unions (if any) will have a ballot with as many offices to be elected as UFT does.

This compressed timeline poses a particular problem for both undeliverable mail and replacement/duplicate ballots. First, the later ballots are mailed, the later GES will receive notice of those which are undeliverable. (*Id.*, ¶18.) Upon receiving returned undeliverable ballots, GES works with the union to identify better addresses for members and mails out new ballots. (*Id.*, ¶18.) That mailing also takes time and, if mailed too late, will not provide sufficient time for members to vote and return the ballot before the deadline. (*Id.*)

The same is true for duplicate/replacement ballots. On April 23, prior to the institution of this suit, the UFT sent a notice to members advising them of the process and timeline for requesting replacement/duplicate ballots. (Cambria Decl., ¶15, Ex. G.) The May 8 date for requests was chosen by GES in conjunction with USPS based upon an estimation of when all members should have received their ballots (if mailed May 1). (Falik Decl., ¶16.) If ballots are mailed later than May 1 or May 2—and thus will be received by many days after May 8—it will result in the date for replacement ballots being pushed later and shortening the time between receipt of a replacement ballot and the deadline for GES to receive the voted ballot. (*Id.*, ¶17.) In the prior election, some 2,000 duplicate/replacement ballots were mailed. (*Id.*) The longer the delay, the larger this issue becomes. There is significant concern that delay will cause frustration and confusion among members and impact voter participation.

Thus, while it is logistically possible for UFT to delay the mailing of the ballots to the morning of May 2 (but not beyond), it is unnecessary. The very reason such delay is possible, is the very same reason it is unnecessary—it will not meaningfully delay the receipt of ballots. Thus, whether mailed on May 1 or the morning of May 2, should the Court so order, an email sent on Monday May 5 would be reasonable and sufficient.

## CONCLUSION

For the foregoing reasons, the UFT respectfully requests that the Court deny Plaintiffs' request for injunctive relief and permit the election to proceed as scheduled.

Dated:  April 28, 2025

Respectfully submitted,

**STEPTOE LLP**

By:    /s/ *Alan M. Klinger*
Alan M. Klinger
Dina Kolker
Alexander A. Langer
STEPTOE LLP
1114 Avenue of the Americas
New York, NY 10036
(212) 506-3900
aklinger@steptoe.com
dkolker@steptoe.com

**WORD COUNT CERTIFICATION**

I hereby certify that this memorandum complies with Local Rule 7.1 of the United States District Courts for the Southern District of New York.  This certificate certifies that the document complies with the word count limit.  Compliance relies on the word count of the word-processing system used to prepare the document.  The total number of the words in this brief, exclusive of the caption, table of contents, table of authorities and signature block is 8,727 words.

Date: New York, New York
     April 29, 2025

By:    */s/ Alan M. Klinger*
     Alan M. Klinger
