# APPENDIX 1

**U.S. Department of Labor**    Office of Labor-Management Standards
Division of Enforcement
Washington, DC  20210
(202) 693-0143  Fax: (202) 693-1343



May 12, 2015



Dear ▮▮▮▮▮▮▮▮ :

This Statement of Reasons is in response to your October 20, 2014 complaint filed with the U.S. Department of Labor alleging that violations of Title IV of the Labor-Management Reporting and Disclosure Act (LMRDA) occurred in connection with the election of officers of the International Brotherhood of Electrical Workers (IBEW), Local 1269 completed on June 18, 2014.

The Department of Labor conducted an investigation of your allegations.  As a result of the investigation, the Department has concluded, with respect to your specific allegations that no violation occurred, which may have affected the outcome of the election.

You alleged that Local 1269 failed to follow its constitution and bylaws when it amended its bylaws replacing the Executive Board Clerical Group III position with a newly-created Executive Board Digital Group III position.  You specifically alleged that the ballot listed ▮▮▮▮▮▮▮▮▮ as the unopposed nominee for Executive Board – Digital Group III, when that position previously had been designated as Group III – Clerical, and Local 1269 made this change without following the above-cited constitution provision.

Section 401(e) of the LMRDA requires that union officer elections be conducted in accordance with the union's constitution and bylaws.  Article XIV, Section 2(a) of the Local's bylaws provides that "these bylaws may be amended or changed by any such proposal being submitted in writing and read at two regular meetings of the Local Union, and decided at the second meeting by a majority vote of the members present and voting."

The investigation revealed that on January 24, 2014, Local 1269 presented this proposed bylaw amendment to the International President, and he approved the change on March 18, 2014.  While it is clear that the union failed to follow the process laid-out in

Article XIV, Section 2(a) of its bylaws, the investigation revealed that there was no effect on the election.  That is, all candidates were aware that the Executive Board Group III Clerical position was now a Group III Digital position, and all eligible members were afforded the opportunity to be nominated and to run for this open position.

You alleged that Local 1269 violated the LMRDA when Election Teller ███████████ used employer funds to copy the incumbent candidates' campaign flyer.  Section 401(g) of the LMRDA prohibits the use of employer resources to promote any candidate for union office.  The investigation revealed that Election Teller ██████ used the employer's computer and copier to make 60 copies of the incumbent candidates' campaign flyer, which invited members to meet with the incumbent candidates at Vito's Express Pizza.  Dunton distributed the flyer at the Pleasanton workplace.

The investigation found that approximately 15-20 members attended the candidates' meeting.  During the election, you raised this issue in a protest to Election Judge █ █████, and █████ found that ████████ use of the employer's computer and copier violated the LMRDA.  █████ required that the incumbent officers reimburse the employer for the copies.  Incumbent candidate for Vice President, █████████████ reimbursed the employer by writing a personal check for $6.00 (this $6.00 amount was determined by █████ – 10 cents per copy).  A controlling principle of the LMRDA is that unions should retain independent authority to remedy violations before the Department's intervention into internal union matters.  As such, the union's Election Judge remedied the violation pre-election, and therefore, there is no violation of the LMRDA that may have affected the outcome of the election.  See 29 U.S.C. § 482(b)("The Secretary shall investigate such complaint and, if he finds probable cause to believe a violation of this title occurred *and has not been remedied*, he shall … bring a civil action against the labor organization…").

You alleged that candidate ██████████ violated the LMRDA by distributing a campaign email that included an endorsement from a former CWA International vice president.  The investigation revealed that on June 6, 2014, ██████ sent a campaign email through the Constant Contact email list that Local 1269 established for candidates' campaign communications.  The subject of the █████ email was "Please see endorsement from CWA International," and it included former CWA Vice President ████████████ endorsement, along with the CWA logo.  All candidate communications sent through the Constant Contact account contained the heading "Election Candidates Communication" and also included a disclaimer that the content in the email represented the views of the candidate and not the views of Local 1269.

You protested ██████ campaign posting to Election Judge █████, who found an infraction and required that ██████ resend the email without the CWA logo.  On June 11, █████ resent the campaign email through the union's Constant Contact

account.  The subject of the June 11 email was "PLEASE SEE ENDORSEMENT FROM *FORMER* CWA INTERNATIONAL," and this communication did not include the CWA union logo.

Under the LMRDA, officers are free to support the candidates of their choice, but may not use union resources in doing so.  *See* 29 C.F.R. § 452.76.  Section 401(g) prohibits the use of union resources to promote a candidate for union office.  The use of the union logo may constitute use of a union resource where the union claims a proprietary interest in the logo and prohibits unofficial use.  Here, pursuant to the IBEW Local Election Guide, "the use of…the IBEW logo by a candidate is forbidden."  However, the Department of Labor investigation did not reveal a similar prohibition on the use of the CWA logo. ▓▓▓▓▓ did not use the IBEW logo; rather, her June 6 campaign email contained the CWA logo.  Accordingly, there was no violation of the LMRDA.  However, even if this were to be viewed as a violation, the Election Judge remedied this infraction during the course of the election.  As such, action based upon this allegation is not warranted.

You also alleged that ▓▓▓▓ violated the LMRDA by traveling out-of-state to campaign at other worksites while on union time and by using union resources.  Specifically, you challenged ▓▓▓▓ trips to Albuquerque, NM (May 21, 2014), Denver, CO (May 22, 2014), and Charlotte, NC (May 27, 2014).

The investigation revealed that ▓▓▓▓ traveled to these three worksites to conduct legitimate union business. ▓▓▓▓ confirmed that while on these trips, she attended union meetings, but stated that she did not campaign to members.  The investigation did not reveal that ▓▓▓ used union resources to campaign. The investigation revealed that ▓▓▓ attempted to hold a union meeting after work hours in Denver (on May 22, 2014), but only one steward showed up, so the meeting was cancelled.  After the meeting had been cancelled, two members showed up and accompanied ▓▓▓ and the union steward for a drink.  While ▓▓▓ did discuss some work issues with these two members, there is no evidence that ▓▓▓ campaigned as a candidate in the upcoming election.  Accordingly, there was no violation of the LMRDA.

You alleged that ▓▓▓▓▓, candidate for Business Manager, campaigned on union time to members in the Pleasanton YP facility lunchroom, but you were denied access to campaign within this facility.  Section 401(c) of the LMRDA prohibits disparate candidate treatment.  29 C.F.R. § 452.66.

The investigation revealed that the employer did not grant a request from ▓▓▓▓ for access while denying a similar request from you.  The investigation revealed that, without employer knowledge or permission, ▓▓▓▓ campaigned for approximately one hour to 30 – 40 members at the Pleasanton facility.  There was no disparate

treatment on the part of the employer.  Because ▮▮▮▮▮ violated employer policy and lacked employer permission when he gained access to a group of employees at the facility lunchroom, there is no disparate treatment of candidates.  Additionally, the investigation revealed that although your request for access was not granted, you were able to campaign to members at this facility.  You were permitted to campaign in an adjacent parking lot.  You talked to members in the adjacent parking lot and sent at least 31 separate campaign email communications to members – including those members at Pleasanton.   Based on these factors, the investigation did not establish a violation that may have affected the outcome of the election.

You alleged that ▮▮▮▮▮▮▮, candidate for President, campaigned on union time to members working on employer time at the Watsonville YP facility.  The investigation revealed that ▮▮▮▮▮ took vacation days (approved leave) on May 22 and 23, 2014, which were the two days that you alleged he campaigned while on union time.  Further, the Department found that while campaigning at the Watsonville facility, ▮▮▮▮▮ only spoke to two members after work hours in the break room.  These members were not on employer time.  Accordingly, there was no violation.

You alleged that ▮▮▮▮▮▮, candidate for Business Manager, had videos produced using misappropriated union equipment, and that he took videos posted on Local 1269's official website and reposted them on his own campaign website.  You raised this issue as a pre-election protest to Election Judge ▮▮▮▮.

Neither the Department's nor the union's investigation of this allegation produced any evidence that the videos at issue were produced using misappropriated union equipment.  The union did, however, determine that the videos at issue on ▮▮▮▮▮ campaign website were originally posted on the Local 1269 website.  These videos were available to anyone with access to the website and could have been used by others in a similar manner.  There was no violation of the LMRDA.  In any event, Election Judge ▮▮▮▮ ordered that ▮▮▮▮▮ immediately remove the videos from his campaign website.  ▮▮▮▮ complied with ▮▮▮▮ decision and removed the videos.

You alleged that ▮▮▮▮▮▮▮ (unopposed candidate for Executive Board Digital Group III), used an official union list, a union resource, to campaign for ▮▮▮▮▮▮.  Section 401(g) prohibits the use of union resources to promote candidacy.  The investigation substantiated that ▮▮▮▮▮ used this union resource to campaign in violation of section 401(g).  However, the investigation also revealed that you protested ▮▮▮▮▮▮ use of a union list to Election Judge ▮▮▮ during the course of the election. ▮▮▮▮ ordered that ▮▮▮▮▮▮ make his list (which only included email addresses of 16 stewards) available to all candidates.  ▮▮▮▮▮▮ immediately complied, providing all candidates with his list.  Accordingly, this violation was remedied, and would not provide a basis for litigation by the Department.

You also alleged that ██████████, candidate for Business Manager, used an official union list, to which you did not have access, for campaign communications.  During the Department's investigation, ██████ revealed that he used an official union list containing 259 email addresses to send campaign communications.  He sent these emails beginning in February 2014 (before Constant Contact was available to other candidates for campaign emails).  ████████ use of a union membership list to send campaign communications constitutes a violation of the LMRDA.

However, the Department of Labor investigation did not provide probable cause to believe that the violation affected the outcome of the election.  First, ████████ list contained only 259 email addresses, compared to the more than 700 member email addresses provided to and used by all candidates through Constant Contact.  The Constant Contact membership mailing list was far more comprehensive.  Second, you, as ████████ opponent, took full advantage of your opportunity to send campaign communications throughout the election period, using the comprehensive Constant Contact database.  In fact, you sent at least 31 separate campaign communications through Constant Contact leading up to the election.  To put this in perspective, the union sent out 27 other campaign communications for all other candidates combined.  Finally, the emails that ████████ sent using the official union list were sent in February – at least four months prior to the election.  You sent campaign communications from February to June, using a far more comprehensive membership list.  There was no violation of the LMRDA that would provide a basis for litigation by the Department.

You alleged that former Business Manager, ████████████, used the local union's newsletter for campaign purposes.  Clearly, the newsletter is produced and sent using union funds, but in considering whether a union-funded communication constitutes promotion of a candidate in violation of section 401(g), the Department evaluates the timing, tone, and content of the particular communication.  *Chao v. North Jersey Area Local Postal Workers Union*, 211 F.Supp.2d 543, 551 (D.N.J. 2002), quoting, *Donovan v. Metropolitan District Council of Carpenters*, 797 F.2d 140, 145 (3d Cir. 1986).

In this case, both newsletters (May 22 and June 4, 2014) addressed issues that you raised in campaign communications.  While the union cannot use its newsletter to campaign for candidates, it can use its newsletter to communicate to members and to defend itself against allegations of misconduct.  In reviewing the content of the newsletters, the union's May 22 and June 4 newsletters do not contain any explicit or subtle references to the upcoming election, let alone any individual candidates.  The content of the articles within each newsletter purely addresses allegations made against the union.  Regarding tone, the article is neutral, in that it does not promote nor disparage any candidate in the election – it serves the purpose of providing the union's position on certain allegations of misconduct.  Although these newsletters were sent during the

election period, timing alone does not create campaign communications. Based on its review, the Department determined that, because only one of the factors used to assess the legality of this type of communication – timing – supports a finding that the newsletters constituted prohibited campaign materials, there was no violation of section 401(g).

You also alleged that winning candidate for Business Manager, ███████████, used union funds to consult with an attorney on campaign-related issues. The investigation did not reveal any evidence that attorneys working for the law firm representing Local 1269 provided any campaign-related advice to ██████. The mere fact that the local union has a law firm to represent it in other matters is not sufficient evidence to establish that union funds were paid to the law firm to promote ██████ candidacy. There was no evidence of such a violation.

You alleged that Local 1269's office staff sabotaged your campaign emails by delaying distribution and changing dates for campaign events, in violation of section 401(c) of the LMRDA. The investigation revealed that the Local's office assistant processed candidates' requests to send campaign communications. While the office assistant acknowledged making clerical errors with your campaign emails, she emphasized that all of your campaign communications were sent in advance of the particular campaign event. Further, the Department found that the union's office assistant made similar clerical errors when processing other candidates' campaign emails – including ██████ campaign communications. The investigation established that there was no disparate candidate treatment with regard to the union's processing of candidates' campaign communications.

You alleged that incumbent candidates used official photographs and biographies, which were posted on the union's website, on their own campaign websites. During the investigation, incumbent officers explained that for a brief period of time, while their campaign website was under construction, they may have posted the same photographs that appear on the Local 1269 website. They explained that once the website was final, these photographs were replaced with ones that were not on the Local 1269 website. The IBEW's position is that, unlike the union logo, officer's photographs are not union property, and may be used as the officer/candidate wishes. There was no violation of the LMRDA.

You also alleged that incumbent candidates ██████████████████████████ used union resources to produce campaign videos. Specifically, you protested the fact that incumbent officers made their campaign videos using the union's office, and that the videographer (Blind Eye Video) produced the incumbent's campaign videos for a slightly discounted rate ($50 less than the normal fee). The Department found that these campaign videos were shot in a conference room in the same building as the

union office, but not within the union's offices. Further, the building manager explained that any tenant has access to these conference rooms at no charge, that is, any union member – provided the conference room is reserved by a tenant, *i.e.* the union. There is no evidence that you, or any other candidate, were denied the opportunity to use these conference rooms to shoot campaign videos.

Regarding the videographer, the LMRDA prohibits the use of "employer" resources to promote a candidate in a union officer election. In order to meet the statutory definition of "employer," that business must employ employees. *See* 29 U.S.C. § 402(e). Blind Eye Video is owned and operated by one individual, ███████. ███████ employs no employees; and thus, is not an "employer" for purposes of section 401(g) of the LMRDA. Based on these findings, the Department found no violation.

In a related allegation, you stated that former Business Manager, ███████ used his title and position in Local 1269 to endorse ███ and other candidates in a video, produced on union time with union funds. Like the videos discussed above, ███████ video was produced by Blind Eye Video. Blind Eye Video is not an employer, as defined by the LMRDA, and any discounted rate that ███████ received did not violate the LMRDA. The investigation revealed that ███████ filmed this brief campaign video while on lunch – not on official union time. In addition, ███████ video provides a personal endorsement of ███████ candidacy, not an official union endorsement. The LMRDA permits a union officer to express a personal endorsement during union elections. *See* 29 U.S.C. § 481(e); 29 C.F.R. § 452.76. The fact that ███████ was the out-going Business Manager does not transform his personal endorsement into a prohibited use of union resources. Accordingly, there was no violation.

Finally, you alleged that former Business Manager ███████ sent a threatening letter to your campaign manager, ███████. Section 401(c) of the LMRDA includes a broad requirement that the union provide adequate safeguards for a fair election. 29 C.F.R. § 452.66. The Department's investigation revealed a letter sent from ███████ to ███████ on or around May 21, 2014. This letter instructed Aquilina – a retired member – to "cease and desist from representing [herself] as an IBEW 1269 member…and…a representative of the IBEW Local 1269," and further instructed her not to solicit phone numbers, email addresses, and other information from union members.

The Department found that this letter was in response to complaints about Aquilina's conduct from two union stewards. The Department does not find that the union's letter violated the LMRDA. Moreover, the Department found that the union's letter had no effect on your campaign activities during the course of the election.

For the reasons set forth above, the Department has concluded that there was no violation of Title IV of the LMRDA that may have affected the outcome of the election, and I have closed the file in this matter.

Sincerely,



Patricia Fox
Chief, Division of Enforcement

cc:     Edwin Hill, International President
        International Brotherhood of Electrical Workers
        900 7th Street, N.W.
        Washington, DC 20001

        Stefan Guthrie, President
        IBEW Local 1269
        870 Market Street, Suite 479
        San Francisco, California 94102

        Christopher Wilkinson, Associate Solicitor
          for Civil Rights and Labor-Management

**U.S. Department of Labor**    Office of Labor-Management Standards
Division of Enforcement
Washington, DC  20210
(202) 693-0143  Fax: (202) 693-1343



June 14, 2011



Dear ██████████

This Statement of Reasons is in response to your September 14, 2010 complaint filed with the United States Department of Labor (Department) alleging that violations of Title IV of the Labor-Management Reporting and Disclosure Act of 1959, as amended (LMRDA or Act), 29 U.S.C. §§ 481 – 484, occurred in connection with the election of officers of the International Alliance of Theatrical Stage Employees of the United States and Canada (IATSE), Local 600 conducted on May 14, 2010.

The Department conducted an investigation of your allegations.  As a result of the investigation, the Department has concluded, with respect to each of your specific allegations that no violation occurred which may have affected the outcome of the election.

You alleged that Local 600 applied an unreasonable Working-at-the-Trade rule (WAT rule) for candidate qualification during the May 2010 election in violation of Section 401(e) of the LMRDA.  Section 401(e) requires in pertinent part that every member in good standing shall be eligible to be a candidate and to hold office subject to reasonable qualifications uniformly imposed.  29 U.S.C. § 481(e).  Here, IATSE adopted a WAT rule at the July 2009 International Convention.  The newly-adopted WAT rule required that in order to be eligible to hold union office a member must have worked at least 120 days, under the union's jurisdiction, over the preceding 36 month period.  *See* IATSE Constitution, Article 19, Section 4.  Further, this constitutional amendment provided that "time served as an officer of a local union shall be applicable towards the 120 days in the past 36 months requirement."  *Id*.

Specifically, you asserted that the WAT rule is unreasonable because the union counted time served as a local officer towards the WAT rule and also because, within the context of the WAT rule, the union interpreted the term "jurisdiction" to only include work performed under the union's collective bargaining agreements (CBA), rather than the union's geographical jurisdiction.

The Department's interpretive regulations presume that unions may apply a working-at-the-trade candidate qualification.  In particular, the regulations state that "it would ordinarily be reasonable for a union to require candidates to be employed at the trade or even to have been so employed for a reasonable period."  29 C.F.R. § 452.41.  And, this regulation further explains that "[a WAT rule] should not be so inflexible as to disqualify those members who are familiar with the trade but who because of illness, economic conditions, or other good reasons are temporarily not working."  29 C.F.R. § 452.41.  Moreover, it is recognized that union officials and employees should not be prevented from running for office or seeking re-election because their service to the union may limit their ability to satisfy the WAT rule.  *See Brock v. Local 630, Int'l Brotherhood of Teamsters*, 662 F.Supp. 118, 124 (C.D. Cal. 1987).

In this matter, it is reasonable for the union to assert that working as a union officer requires knowledge of the members' working conditions and jobs being performed; requires knowledge of the interests of union members working within the local's collective bargaining agreements; and requires working on organizing efforts, which are all valuable services to the overall performance of the union.  Certainly, serving as a union officer or employee constitutes a "good reason" for not being actively employed in the craft for a certain period of time.  Accordingly, the Department did not find the union's treatment of incumbent officers as unreasonable.

The Department also investigated your assertion that the union has unreasonably interpreted "jurisdiction" within the context of the WAT rule as meaning work under a Local 600 CBA.  It is well-established that when union officials have offered an interpretation of the constitution that is not clearly unreasonable, the Department will defer to the union.  *See* 29 C.F.R. § 452.3. *See also United Brotherhood of Carpenters, Lathers Local 42-L v. United Brotherhood of Carpenters*, 73 F.3d 958, 961 (9th Cir. 1996); *Busch v. Givens*, 627 F.2d 978, 980 (9th Cir. 1980); *Stelling v. Int'l Brotherhood of Electrical Workers, Local 1547*, 587 F.2d 1379, 1389 (9th Cir. 1978).  As you have stated in your protest, the union's constitution does, in one section, define jurisdiction in geographical terms, *i.e.*, "the United States and its territories."  *Local 600 Constitution*, Article 1, Section 3.  However, the union's constitution must be read and interpreted in its entirety.

The Department reviewed the Local 600 Constitution and found that Article 13 "Working Conditions," Sections 10-12, 14, and 17, repeatedly refer to "jurisdiction" as meaning CBA work and not the geographical location.  For example, Article 13, Section 11 (Member's Duty) states that "it shall be the duty of every member when working with or selecting an employee for work *within the territory and jurisdiction* of this Guild, to see that said employee is a member in good standing of this Guild." (emphasis added).  Further, Article 13, Section 17 (Overseas Assignments) states that "a member of this Guild who desires to accept an assignment to work *over which this Guild has jurisdiction, but which will carry the member outside the United States and territories*, must have the proposed working conditions and wages approved…" (emphasis added).  The union repeatedly separates the geographical nature of the work from the jurisdictional

nature of the work, demonstrating that the union does use the term jurisdiction to refer to work under a CBA.  The Department determined that the union's interpretation of "jurisdiction" within the context of the WAT rule as meaning work under a Local 600 CBA is a fair and reasonable interpretation.  This is not a violation of the LMRDA.

You also alleged that the union sent campaign emails to the Local 600 membership in violation of Section 401(g) of the LMRDA.  Section 401(g) prohibits the use of union funds to promote any candidate for union office.  Specifically, you alleged that the union sent emails on April 16, 2010 and May 8, 2010, to rebut positions taken in your campaign emails concerning whether or not members should vote to dissolve Local 600's non-profit mutual benefit corporate status.  The Department's investigation found that contemporaneous with the election, the local membership was voting on a resolution regarding the corporate status of Local 600.  Campaign materials related to this issue of corporate status were sent from both incumbent and insurgent candidates.

In order to ascertain whether a union funded communication constitutes promotion of a candidate in violation of Section 401(g), the Department evaluates the timing, tone, and content of the particular communication.  First, the Department reviewed the overall content of these emails and found that neither email mentions the May 2010 officer election.  Further, no candidates for the upcoming election were named or discussed.  Rather, the content of these emails deals entirely with the corporate dissolution vote.  While the issue of corporate dissolution was a campaign issue raised by candidates during the election period, these particular emails do not frame the dissolution vote as a campaign issue as there is no mention of the upcoming election or any candidates by name.

Second, with respect to tone, the two emails do not promote or disparage any candidate.  There is no electioneering.  Rather, the emails state the union's position on this important issue that the membership will be voting on.  The union's emails address this issue in a matter-of-fact way without making any reference to the election or any individual's candidacy.

Third, the Department reviewed the timing of the two emails and determined that since both emails were sent within one month of the May 2010 election, the timing is the only factor that weighs in favor of a finding that the email communications constituted campaigning.  Accordingly, the overall tone, content, and timing of these two email communications did not endorse, promote, or disparage any candidate in the May 2010 election, and therefore, there was no violation of the LMRDA.

You also alleged that incumbent President, ███████████ used the union's membership email database which contains over 6,000 email addresses to send campaign mailings to over 6,000 members.  However, the union did not make this database available to other candidates.  Instead, Local 600 created an email database with Action Mailing Services (AMS) and permitted all candidates to pay AMS a fee to send campaign emails through this membership database.  The email database created for the mailing service made

available for use by candidates contained less than 6,000 email addresses. As stated above, Section 401(g) of the LMRDA prohibits the use of union funds or resources to promote any candidate for union office. Section 401(c) prohibits unions from discriminating in favor of or against any candidate.

The Department's investigation revealed that President ████ only sent campaign emails to approximately 3,800 Local 600 members. This list included email addresses that members provided to President ████, including members who had visited his campaign website and submitted their email addresses. ████ uploaded his list of email addresses to Constant Contact and used Constant Contact rather than AMS to send his campaign emails. Further, you also take issue with ████ s use of Constant Contact to send his campaign emails rather than AMS the union provided mailing service. The Department's investigation disclosed that candidates were not prohibited from using other email services to send campaign communications. The Department determined that President ████ did not access the Local 600 official email database for his campaign communications, but instead sent campaign communications to a limited group of email addresses that he had personally compiled and maintained. There was no violation of the Act.

You also alleged that individuals may have filed false spam email reports with AMS in order to have insurgent candidate campaign emails blocked in violation of Section 401(c) of the LMRDA. The Department's investigation disclosed that AMS received reports of spam email relating to two insurgent candidates' campaign email blasts. During the Department's investigation, AMS explained that the email blasts were delayed less than 24 hours and were ultimately delivered to the recipients. The evidence provided by AMS failed to even suggest any malicious intent relating to the spam reports. Moreover, you did not provide any evidence to support a finding of tampering or wrongdoing by any candidate for union office. Accordingly, there is no violation of the Act.

For the reasons set forth above, it is concluded that no violation of the LMRDA occurred.  Accordingly, the office has closed the file on this matter.

Sincerely,


Patricia Fox
Chief, Division of Enforcement

cc:     Matthew D. Loeb, International President
        IATSE
        1430 Broadway, 20th Floor
        New York, NY 10018

        Steven Poster, National President
        IATSE Local 600
        7755 Sunset Boulevard
        Los Angeles, CA 90046

        Beverly Dankowitz, Acting Associate Solicitor
        Civil Rights and Labor-Management

**U.S. Department of Labor**    Office of Labor-Management Standards
Division of Enforcement
Washington, DC  20210
(202) 693-0143  Fax: (202) 693-1343



June 14, 2011



Dear ████████

This Statement of Reasons is in response to your September 22, 2010 complaint filed with the United States Department of Labor (Department) alleging that violations of Title IV of the Labor-Management Reporting and Disclosure Act of 1959, as amended (LMRDA or Act), 29 U.S.C. §§ 481 – 484, occurred in connection with the election of officers of the International Alliance of Theatrical Stage Employees of the United States and Canada (IATSE), Local 600 conducted on May 14, 2010.

The Department conducted an investigation of your allegations.  As a result of the investigation, the Department has concluded, with respect to each of your specific allegations that no violation occurred which may have affected the outcome of the election.

You alleged that Local 600 applied an unreasonable Working-at-the-Trade rule (WAT rule) for candidate qualification during the May 2010 election in violation of Section 401(e) of the LMRDA.  Section 401(e) requires in pertinent part that every member in good standing shall be eligible to be a candidate and to hold office subject to reasonable qualifications uniformly imposed.  29 U.S.C. § 481(e).  Here, delegates voted to adopt a WAT rule at the July 2009 International Convention.  The newly-adopted WAT rule required that in order to be eligible to hold union office a member must have worked at least 120 days, under the union's jurisdiction, over the preceding 36-month period.  *See* IATSE Constitution, Article 19, Section 4.  Further, this constitutional amendment provided that "time served as an officer of a local union shall be applicable towards the '120 days in the past 36 months' requirement."  *Id.*  Specifically, you asserted that the WAT rule is unreasonable because (1) the WAT rule may disproportionately discriminate against women, minorities, and older union members; and (2) the union's interpretation of the term "jurisdiction" as only including work performed under the union's collective bargaining agreements (CBA), rather than the union's geographical jurisdiction is unlawful.

You alleged that the WAT rule is an unreasonable qualification for candidacy because it disproportionately discriminates against women, minorities, and older union members. The Department's interpretive regulations presume that it is reasonable for unions to apply a working-at-the-trade candidate qualification.  In particular, the regulations state that "it would ordinarily be reasonable for a union to require candidates to be employed at the trade or even to have been so employed for a reasonable period."  29 C.F.R. § 452.41.  However, the Department's interpretive regulations prohibit unions from adopting candidate qualifications that violate Federal law, such as the Civil Rights Act of 1964 and the Age Discrimination in Employment Act (ADEA).  *See* 29 C.F.R. § 452.46.  These particular Federal laws protect women, minorities, and older workers from employment discrimination.

The WAT rule at issue is not discriminatory on its face, as all members regardless of gender, race, nationality, and age are treated the same, *i.e.*, each member seeking office must work 120 days, under the union's jurisdiction, over the 36 months immediately preceding the election in order to qualify for union office.  You have asserted that you believe that this facially-neutral WAT rule will act to disproportionately bar women, minorities, and older members from qualifying for union office because these groups of individuals receive less union work than younger white males in the industry.  Your alleged Title IV violation is predicated upon your belief that this particular industry operates by discriminating against certain protected classes.  However, the assertion that the industry discriminates against certain protected groups is beyond the scope of the investigation as well as the parameters of Title IV of the LMRDA.

The Department also investigated your assertion that the union has unreasonably interpreted "jurisdiction" within the context of the WAT rule as meaning work under a Local 600 CBA.  It is well-established that when union officials have offered an interpretation of the constitution that is not clearly unreasonable, the Department will defer to the union.  *See* 29 C.F.R. § 452.3.  *See also United Brotherhood of Carpenters, Lathers Local 42-L v. United Brotherhood of Carpenters*, 73 F.3d 958, 961 (9th Cir. 1996); *Busch v. Givens*, 627 F.2d 978, 980 (9th Cir. 1980); *Stelling v. Int'l Brotherhood of Electrical Workers, Local 1547*, 587 F.2d 1379, 1389 (9th Cir. 1978).  As you have stated in your protest, the union's constitution does, in one section, define jurisdiction in geographical terms, *i.e.*, "the United States and its territories."  *Local 600 Constitution*, Article 1, Section 3.  However, the union's constitution must be read and interpreted in its entirety.

The Department reviewed the Local 600 Constitution and found that Article 13 "Working Conditions," Sections 10-12, 14, and 17, repeatedly refer to "jurisdiction" as meaning CBA work and not the geographical location.  For example, Article 13, Section 11 (Member's Duty) states that "it shall be the duty of every member when working with or selecting an employee for work *within the territory and jurisdiction* of this Guild, to see that said employee is a member in good standing of this Guild." (emphasis

added).  Further, Article 13, Section 17 (Overseas Assignments) states that "a member of this Guild who desires to accept an assignment to work *over which this Guild has jurisdiction, but which will carry the member outside the United States and territories*, must have the proposed working conditions and wages approved…"  (emphasis added).  The union repeatedly separates the geographical nature of the work from the jurisdictional nature of the work, demonstrating that the union does use the term jurisdiction to refer to work under a CBA.  The Department determined that the union's interpretation of "jurisdiction" within the context of the WAT rule as meaning work under a Local 600 CBA is a fair and reasonable interpretation.  This is not a violation of the LMRDA.

In addition, you have alleged to the Department that the WAT rule is unlawful because the union counts time served as a local officer towards meeting the 120-day requirement.  This particular allegation was not initially included in your election protest to the union, and thus, was not properly exhausted as required by Section 402 of the LMRDA.  *See* 29 U.S.C. § 482(a).  Section 402 limits the Department of Labor's authority and a court's jurisdiction over allegations raised by aggrieved union members who have not exhausted their internal union remedies.  *See Martin v. Local 480, Int'l Brotherhood of Teamsters*, 946 F.2d 457, 461 (6th Cir. 1991).  However, this same allegation was properly exhausted and presented to the Department by another Local 600 member's complaint.

The Department did investigate this allegation in response to his complaint and determined that the union's treatment of incumbent officers was reasonable.  Specifically, the Department's regulations presume that it is reasonable for a union to apply a WAT rule to candidate eligibility.  *See* 29 C.F.R. § 452.41.  Further, "[a WAT rule] should not be so inflexible as to disqualify those members who are familiar with the trade but who because of illness, economic conditions, or other good reasons are temporarily not working."  29 C.F.R. § 452.41.  It is also recognized that union officials and employees should not be prevented from running for office or seeking re-election because their service to the union may limit their ability to satisfy the WAT rule.  *See Brock v. Local 630, Int'l Brotherhood of Teamsters*, 662 F.Supp. 118, 124 (C.D. Cal. 1987).  Here, it is reasonable for the union to assert that working as a union officer requires knowledge of the members' working conditions and jobs being performed; requires knowledge of the interests of union member working within the local's collective bargaining agreements; and requires working on organizing efforts, which are all valuable services to the overall performance of the union.  Certainly, serving as a union officer or employee constitutes a "good reason" for not being actively employed in the craft for a certain period of time.  Accordingly, the union's treatment of incumbent officers was reasonable.

You further alleged that the union failed to provide members with adequate notice of indebtedness, resulting in "secret suspensions" which prevented members from voting,

nominating, and being nominated in violation of Section 401(e).  In particular, you asserted that the union's dues collection system is controlled by difficult rules that are hard to follow and that Local 600 should provide more advanced notice before suspending members for failing to pay dues or assessments.  You identified members who may have been disqualified or may know others who were disqualified.

During the Department's investigation, Local 600 officials stated that members are only suspended if they are in arrears for more than 60 days from the date that the union notifies them of the dues or assessments owed.  While a member is not held responsible for an employer's failure to remit timely assessments, the union notifies the member of any such arrearage and allows the member 60 days to pay before losing good standing.  During the Department's investigation, the election committee explained that members in arrears each received two 30-day notices prior to being suspended.

The investigation further disclosed that the Quarterly Dues/Assessments Notices are sent to members and clearly state that payments must be paid by the "Due Before" date identified at the top of the billing notice.  Union officials stated that if the union does not receive the stated amount within 60 calendar days of the "Due Before" date, the member is suspended from membership.  A suspended member is no longer in good standing and is not eligible to vote in union elections.  Members are instructed to call the local union to determine if they are eligible to enter into a payment plan if unable to pay the total amount due.  The Department's investigation found that members were properly notified of their financial obligations in accordance with the union bylaws.

In response to your allegation that specific members may have been improperly suspended, the Department interviewed Local 600 member ▮▮▮▮▮▮▮▮▮▮  The Department's investigation revealed that ▮▮▮▮▮ owed $3.85 in assessments.  His employer failed to pay his 1% assessment for the one day he worked during the past year. ▮▮▮▮▮ admitted to having received his regular Dues/Assessments billing statement, which stated that he owed $3.85.  Since ▮▮▮▮▮ did not pay this arrearage until after the due date, he was properly disqualified from running for a union officer position, but was able to run for union delegate.

Local 600 member ▮▮▮▮▮▮▮▮▮▮ was late for one quarterly payment during the two-year continuous good standing period.  The Department found that ▮▮▮▮▮ was properly notified, as he admitted that he received a dues bill for that quarter stating that he was in arrears 30 to 60 days.  During the investigation, ▮▮▮▮▮ stated that he paid these owed dues late.  Finally, the Department reviewed ▮▮▮▮▮▮▮▮▮▮ s membership status.  The Department found that ▮▮▮▮ was deemed ineligible in the election because she failed to remain in good standing for the two-year continuous good standing period. ▮▮▮▮ did not contest the eligibility finding and admitted that she received

notices of owed dues, but did not pay the back dues.  Accordingly, there is no violation of the Act.

For the reasons set forth above, it is concluded that no violation of the LMRDA occurred.  Accordingly, the office has closed the file on this matter.

Sincerely,


Patricia Fox
Chief, Division of Enforcement

cc:    Matthew D. Loeb, International President
       IATSE
       1430 Broadway, 20th Floor
       New York, NY 10018

       Steven Poster, National President
       IATSE Local 600
       7755 Sunset Boulevard
       Los Angeles, CA 90046-3911

       Beverly Dankowitz, Acting Associate Solicitor
       Civil Rights and Labor-Management

**U.S. Department of Labor**    Office of Labor-Management Standards
Division of Enforcement
Washington, DC  20210
(202) 693-0143  Fax: (202) 693-1343



February 7, 2020




Dear ███████████ :

This Statement of Reasons is in response to your complaint filed on May 31, 2018, with
the United States Department of Labor alleging that violations of Title IV of the Labor-
Management Reporting and Disclosure Act (LMRDA or Act) occurred in connection
with the election of officers of United Food and Commercial Workers Local 555 (Local
555 or Union), conducted on September 7, 2017.

The Department conducted an investigation of your allegations.  As a result of the
investigation, the Department has concluded, with respect to the specific allegations,
that there was no violation of the LMRDA that may have affected the outcome of the
election.

You alleged that Local 555 improperly used union funds, equipment, supplies, or time
to campaign.  Section 401(g) of the LMRDA prohibits the use of union resources to
promote the candidacy of any person in union officer elections.  Specifically, you
alleged that incumbent officers campaigned through the Union's Facebook page and
mailings between July and August 2017, including the union newspaper.  In
determining whether a union publication promotes a person's candidacy, courts
evaluate the communication's timing, tone, and content.  With respect to timing, the
mailings and newspapers were distributed to members through the two-month period
before the election.  The Department's review of the mailings sent to Oregon members
indicated that they were related to union business, specifically, advocating Fair Work
Week legislation around the time of the Oregon State legislative session.  Similarly, the
Union's Facebook page post, dated September 4, 2017, did not mention the election but
rather referenced the Fair Work Week legislation.  The tone of the mailings,
newspapers, and Facebook page did not promote the incumbent officers and was not
critical of any potential opposition nominees.  The content of the mailings, Facebook
page, and newspapers—including the president's and secretary-treasurer's articles—
did not encourage or endorse the reelection of the incumbent officers.  Thus, the
mailings, Facebook page, and newspapers did not constitute campaign material.
Consequently, union resources were not unlawfully used in the distribution of the

mailings and newspapers, or the Union's Facebook page post.  The LMRDA was not violated.

You next alleged that Union Representative Ron McDade campaigned on union time on August 31, 2017.  The investigation revealed that although Representative McDade campaigned on August 31, 2017, he was on leave on paid time off.  There was no violation of the Act.

You alleged that the Union allowed True Ballot, a contractor hired by the Union to assist with the election, to unlawfully interfere with the election, particularly during the tally.  Section 401(c) of the LMRDA prohibits disparate treatment among candidates for union office.  Section 401(c) also requires unions to provide adequate safeguards to ensure a fair election.  Thus, a labor organization's discretion regarding the conduct of an election is circumscribed by a general rule of fairness.  29 C.F.R. § 452.110.  The Union hired True Ballot to format, print, mail, and tally ballots—tasks that do not constitute improper interference in the election under the Act.  The Election Committee handled and decided any questions about whether a particular race or ballot should be counted, and about how to interpret a voter's intent.  The Department's review of election records did not reveal any evidence of ballot tampering, or any concerns about the count of ballots.  There was no violation of the Act.

You further alleged that True Ballot improperly caused the Union to disallow slate names on the ballot and changed established deadlines for submitting candidate biographies.  The investigation revealed that the Election Committee—not True Ballot— decided to list candidates alphabetically in the same manner as in the Union's 2008 election—the last election with slates.  The official candidate rules distributed on August 8, 2017 also indicated that candidates would be listed alphabetically.  Further, slate names were permitted on the candidate biographies that were distributed with the ballot packages.  No candidates were treated disparately in regards to the non-use of slate names on the ballot.  The LMRDA was not violated.

The investigation confirmed that, at the request of True Ballot, the Election Committee moved the deadline for submitting candidate biographies earlier by four days to ensure that candidate statements and ballots would be printed and mailed by the August 18, 2017 ballot mailing deadline.  No candidates were treated disparately because the deadline change was applied to all candidates.  The investigation also confirmed that there was no requirement to hand-deliver biographies.  Additionally, all candidates met the new deadline and had their biographies mailed out in the ballot packages.  There was no violation of the Act.

In sum, as a result of the investigation, the Department has concluded that there was no violation of the Act that may have affected the outcome of the election in connection with your allegations that were properly filed.  As to allegations in your complaint to the Department not addressed in this Statement of Reasons, these issues were not

considered because the allegations were not properly exhausted.  Accordingly, I have closed the file on this matter.

Sincerely,



Brian A. Pifer
Chief, Division of Enforcement

cc:   Marc Perrone, International President
      United Food and Commercial Workers
      1775 K Street, NW
      Washington, DC 20006-1598

      Dan Clay, President
      United Food and Commercial Workers Local 555
      7095 SW Sandburg Street
      Tigard, OR 97223

      John Bishop, Esq.
      7095 SW Sandburg Street
      Tigard, OR 97223

      ███████████, Associate Solicitor
      Civil Rights and Labor-Management Division

3

**U.S. Department of Labor**     Office of Labor-Management Standards
Division of Enforcement
Washington, DC  20210
(202) 693-0143  Fax: (202) 693-1343



December 9, 2014



Dear ███████████:

This Statement of Reasons is in response to your September 26, 2014 complaint filed with the U.S. Department of Labor alleging that violations of Title IV of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA) occurred in connection with the election of officers conducted by the International Brotherhood of Electrical Workers Local Union (IBEW) Local 46 in June 2014.

The Department conducted an investigation of your allegations.  As a result of the investigation, the Department has concluded that no violation occurred that may have affected the outcome of the election.  Following is an explanation of this conclusion.

In your complaint, you challenged the eligibility of six candidates for office, and alleged that, in allowing them to run for office, the Local violated section 401(e) of the LMRDA.

First, you alleged that winning candidate Sean Bagsby was not eligible to run for office, as his nomination was made by a retired member of the Local.  Neither the Local's bylaws nor the IBEW Constitution address whether retired members may make nominations for local elections.  Even if such nominations were prohibited, though, there was no effect on the outcome of the election in this case, as active members indicated they would have nominated Mr. Bagsby had the retired member not done so or if that nomination were deemed invalid.

Next, you alleged that three candidates were "supervisors" under the Department's regulations, and thus ineligible to run for or hold office.   The investigation revealed that only two of these three candidates were serving as foremen or general foremen at the time of the election, and none of the three had hiring, termination, or promotion authority.  Thus, there was no "reasonable basis for assuming that the [candidates] involved would be subject to a conflict of interest in carrying out [their] representative duties for employees and rank and file union members."  29 C.F.R. § 452.47.  The candidacies of the foremen were in accord with the International's stated policy, which states that such foremen are "entitled to participate in local union affairs and elections."  Accordingly, the candidacies of these individuals did not violate the LMRDA.

You also alleged that two candidates were ineligible to run for office because of their affiliations with other businesses, namely an apparel business and a fast food restaurant.  Your eligibility

challenges are based on the facts that (1) both candidates are "employers" and (2) one of the businesses employs minimum wage workers.

Section 401(e) of the LMRDA requires union officer elections to be conducted in accordance with the union's constitution and bylaws. Article XV, § 5, of the IBEW Constitution, prohibits "electrical employer[s]" from holding office. The investigation revealed that neither of these candidates employs workers in businesses that are electrical concerns, and neither employs any members of IBEW or IBEW Local 46. Thus, there is no violation of the union constitution or the LMRDA. Moreover, no provision of the LMRDA or the union's constitution or bylaws bars employers of minimum wage workers from holding office; thus, there was no violation.

You also alleged that there was voter confusion due to the inclusion of a notice in the ballot package, informing members that one of the candidates for Business Manager had withdrawn from the race, though his name remained on the ballot. You claim that this confusion constituted a violation of section 401(c) of the LMRDA. That section requires that unions provide adequate safeguards to ensure a fair election.

The investigation revealed that the IBEW International Constitution permits candidates for office to withdraw their candidacy at any time. Here, where a candidate withdrew after ballots were printed, the union's indicating such on a separate notice accompanying the ballot actually was a measure to ensure the fairness of the election. The Local acted reasonably and did not violate the LMRDA. There was also no evidence that voters were actually confused. Even if there had been, the candidate at issue only received 11 votes, and the winning candidate for Business Manager prevailed by over 200 votes; as such, there was no possible effect on the outcome of the election.

You alleged that ballots were not properly counted due to the arbitrary nature in which ballots were deemed to contain "distinguishing marks" and thus not counted. The investigation determined that four ballots were not counted on this basis and should have been, in violation of the statute. However, the failure to count these ballots had no effect on the outcome of the election. Had these four ballots been counted, the outcome of the election would have remained the same, as the smallest margin of victory was eight votes.

With regard to the runoff election held for the position of Vice President, you alleged that the Local improperly used union resources, the union newsletter, to promote the candidacy of one of the candidates for office. The investigation revealed that the Business Manager's Report in the June 2014 local newsletter did compliment one of the candidates for office. It did so, though, in the context of recent, newsworthy action taken by that candidate, and did not mention her candidacy. As the tone, content, and timing of the publication do not demonstrate an effective endorsement or encouragement of her candidacy, there was no violation of the LMRDA. *See, e.g., Conery v. Niccollai*, No. CIV.A. 92-840 (JAG), 1998 WL 34076966, at *4 (D.N.J. Feb. 2, 1998).

Your complaint also included allegations relating to the potential mishandling of ballots by the postal service, and the late delivery of timely ballots by the postal service. The investigation did not corroborate these allegations or suggest any union action or inaction, and thus there was no violation.

Finally, you alleged that members who lived "outside the jurisdiction" were unfairly denied the right to vote, in violation of section 401(e) of the LMRDA, because the ballots were required to

be received by the deadline, as opposed to postmarked by that deadline.  The LMRDA does not require local unions to use a postmark date as a cutoff date for ballots.  Here, members received advance notice of the election in April 2014, which informed them of the receipt deadline, and ballots were mailed 18 days prior to the deadline, giving all members of the Local ample notice and time to complete and return their ballots so that they would be received by the deadline.

For the reasons set forth above, it is concluded that no violation of the LMRDA occurred that may have affected the outcome of the election.  Accordingly, the office has closed the file on this matter.

Sincerely,


Patricia Fox
Chief, Division of Enforcement

cc:    Edwin D. Hill, International President
       International Brotherhood of Electrical Workers
       900 Seventh Street, N.W.
       Washington, DC 20001

       Sean L. Bagsby, President
       IBEW Local 46
       19802 62nd Avenue South
       Kent, WA 98032

       Christopher B. Wilkinson
       Associate Solicitor for Civil Rights and Labor-Management

**U.S. Department of Labor**     Office of Labor-Management Standards
Division of Enforcement
Washington, DC  20210
(202) 693-0143  Fax: (202) 693-1343



December 8, 2015



Dear ██████████

This Statement of Reasons is in response to your November 17, 2014 complaint filed
with the United States Department of Labor (Department) alleging that violations of
Title IV of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA)
occurred in connection with the election of officers held by the Operative Plasterers' &
Cement Masons' International Association (OPCMIA) (the union), on August 12, 2014.
Your complaint to the Department contained the allegations that you raised in your
post-election protest dated August 13, 2014.

In your protests, you made numerous overlapping allegations, which implicate
requirements of the LMRDA.  The Department conducted an investigation of your
allegations.  As a result of the investigation, the Department has concluded that a
violation of the LMRDA occurred in two instances, but did not affect the outcome of the
election.  No violations were found with respect to your remaining allegations.  Below
is an explanation of this conclusion according to the relevant requirements of the
LMRDA.

<u>Delegate Eligibility</u>

In your protests before and after the election, you made a number of allegations relating
to the incumbent slate's challenges to the eligibility of delegates prior to the
Convention.  Specifically, you alleged that the union selectively challenged the
delegates to the convention who were supporting your slate and that the credentials
committee summarily disallowed the challenges to eligibility made by your slate.  These
allegations implicate the LMRDA's requirement that every international labor
organization select its officers either by secret ballot among the members in good
standing or at a convention of delegates chosen by secret ballot and the requirement
under the Act's regulations that union election procedures be fair to all members.

The investigation revealed that the incumbent slate through its representative challenged thirteen (13) delegates, and the credentials committee upheld ten (10) of those challenges.  According to OLMS's investigation, these members were properly disqualified from voting and did not vote.  Each delegate is allowed one vote. The investigation also revealed that your slate sent ▮▮▮▮▮▮▮ to the credentials committee to present challenges of twenty-one (21) delegates, however the challenges were all rejected on the basis of lack of documentation and ▮▮▮▮ lack of personal knowledge. The investigation also revealed that your slate sent ▮▮▮▮▮▮▮ to present challenges of twenty-one (21) delegates to the credentials committee, but they were all rejected on the basis of lack of documentation and his lack of personal knowledge.  The investigation indicated that eight (8) of these challenges should have been upheld because one delegate did not meet the working-at-the-trade requirement, one delegate had been nominated without proper notice of the nominations to members, three delegates were appointed, and three delegates were local union officers mistakenly believed to be delegates by virtue of their position (ex officio).  Accordingly, the investigation confirmed a violation.  In the election at issue, the closest margin was thirty (30) votes (office of Plasterer Vice-President) so that, even if the challenges had been accepted by the credentials committee, the resulting ineligibility of those delegates could not have affected the election.

In addition, as part of its investigation into this allegation, OLMS also investigated the eligibility of other delegates from additional locals and found that many locals had sent delegates who had been improperly elected, been appointed, or incorrectly assumed that certain local officers were ex-officio delegates when this was not provided in the local's by-laws.  However, these additional violations affected twenty (20) votes, which still did not affect the outcome of the closest race. It also should be noted that not only was the international's failure to disqualify those improperly selected delegates a violation, the failure of those locals to properly select their delegates was a violation of the Act.

Also with respect to the delegate election, you alleged that the incumbents refrained from making delegate challenges until it was too late to rerun elections.  Some of the thirteen (13) delegates whose credentials were challenged stated that they were not informed that their credentials were invalid until they arrived at the convention to register.  The investigation revealed that the union did not establish a time period for making challenges and treated candidates equally with respect to the timing of challenges.  The LMRDA has no such requirement. Accordingly, there was no violation.

Access to the Delegate List

You alleged that the list of delegates to the convention was not timely or properly provided to your slate.  Under the LMRDA, under certain conditions, a  bona fide

candidate has a right to a one-time inspection of a list of members covered by collective bargaining agreement within thirty days prior to an election. Assuming, for the sake of argument, that inspection of a delegate list is considered similarly, the investigation indicates that this request was granted; your slate was permitted to review the delegate list on August 10, 2014, two days before the election. The evidence gathered indicates that your slate members were not permitted to write down members' names and that the delegate list did not indicate whether delegates were appointed or elected. However, the Act does not provide the right to copy the list or that the list must indicate such delegate status. Accordingly, there was no violation.

You also alleged that the delegate list was used by ▮▮▮▮▮▮▮ prior to the convention to challenge delegate eligibility; specifically, ▮▮▮▮▮▮ had access to the delegates list to challenge eligibility. This allegation implicates the union's duty under the LMRDA to refrain from discrimination in favor of or against any candidate with respect to use of lists of members. The investigation indicated the information used for the delegate challenges came from experience with different locals' policies and by-laws and reading field representative reports. You did not furnish, nor did the investigation reveal, any evidence that ▮▮▮▮ used a delegate list to challenge delegate eligibility. Accordingly, there was no violation.

Also relating to the delegate list, you alleged that your slate requested access to the delegate list in order to distribute literature at the slate's expense and did not receive the procedure for distributing its literature to the delegates on the list. In addition, you alleged that no procedure was provided prior to the convention for distribution of campaign materials by mail to delegates. Under the Act, an international is obligated to comply with a candidate's reasonable request to distribute campaign literature at his or her expense to members, but it does not require that the procedure be provided absent any request. Neither the Act nor your union's constitution entitled you to a copy of the list. The investigation revealed that you submitted a written request on July 18, 2014, requesting a copy of the delegate list, explaining that you intended to use it to distribute campaign literature to the delegates. The evidence indicates that the union's attorney responded by letter, dated July 25, 2014, via overnight mail, stating that you were not entitled to a copy of the list. He also acknowledged a candidate's right to make a reasonable request to distribute campaign literature at his or her expense, and stated that the union had not received such a request as of that date. The evidence does not indicate that your slate subsequently made a request to the union to distribute your campaign literature. Accordingly, there was no violation.

Improper Use of Union Resources

A number of your allegations relate to the prohibition on use of union and employer resources to promote the candidacy of persons for union office. In your protest and in

response to the union's request for specific information relating to the allegations, you provided more specific factual  allegations:  you asserted that the incumbent slate used the union journal to promote their candidacies, that it produced a campaign video with union resources, that it campaigned during work time, that it used union resources to investigate challenges prior to the election on a discriminatory basis, that it threatened delegates during visits to locals, and that it was provided with the delegates' email addresses prior to the convention for the distribution of campaign materials.  With respect to the convention, you asserted that the union may have used union funds to arrange for campaigning.

Under the Act, no moneys received by a labor organization by way of dues, assessment, or similar levy may be used to promote the candidacy of any person.  With respect to the journal article, to determine whether such article constituted unlawful union-financed campaigning, OLMS considered the timing, tone, and content of the article to determine whether it effectively endorsed the candidacies of the incumbent slate.  While the investigation revealed that the journal was published in the summer of 2014 prior to the August 12, 2014 election, its tone and content did not rise to the level of unlawful campaigning.  The incumbent president made a laudatory statement about each of two candidates on his slate in the overall context of the work those incumbent officers had done over the prior years.  Without more, however, those statements do not violate the Act. There was no mention of the election or inclusion of campaign rhetoric.  Accordingly, there was no violation.

OLMS investigated your allegation relating to the campaign videos and found that the incumbent slate created three campaign videos, but did not find any evidence that the incumbent slate worked on the videos while on union time or that they used the union's equipment.  Although the president used a JobCorps office outside of regular work hours to make videos, the use of the JobCorps office, which is not a union facility, is not a violation.  Likewise, OLMS investigated whether the incumbent president campaigned during working time.  The union president stated that he did make campaign phone calls to business managers, but that he did so on his own time and with his personal phone.  Interviews with over 20 local business managers did not produce evidence, except in one instance, that these calls were made during work hours, and that one vote would not have affected the outcome of the election.  No one stated that the international staff made campaign statements or threatened local delegates during visits to locals.  Nor did the investigation find that the incumbent slate was provided with the delegates' email addresses for distribution of campaign materials prior to the convention.  The investigation found that candidates used their own person email lists or replied to other group emails to members with their own campaign material.  Accordingly, there were no violations.

With respect to the alleged improper use of union resources at the convention, the investigation found that the incumbent slate used its own funds to purchase the campaign key cards distributed to delegates and the electronic sign displaying campaign slogans. Your slate was not prevented from spending its funds to obtain similar promotional materials. Accordingly, there was no violation. Therefore, except as discussed below, the investigation did not uncover any other evidence that the incumbent slate used union resources for campaigning.

The investigation did reveal that candidate ▆▆▆▆▆▆▆▆ of the incumbent slate sent a campaign email to delegates attaching a letter written on union letterhead with the union logo. The letter detailed ▆▆▆▆▆▆ accomplishments and asked delegates for their support in the election. The use of union logo is sometimes considered as the use of a union asset. Accordingly, a violation may have occurred. However, you did not include this specific violation in either your original protest or follow-up description of your allegations. Therefore, this violation cannot be considered within the scope of your complaint to the Secretary and could not provide a basis for litigation.

Disparate Treatment Regarding Campaign Opportunities

You alleged that there was no communication informing all candidates of equal access to hotel resources or campaign material. In this regard, you also alleged disparate treatment of your slate with respect to campaigning opportunities. Under the LMRDA, a union is obligated to provide adequate safeguards to insure a fair election. As interpreted in the LMRDA's regulations, such safeguards include an equal opportunity for all candidates to campaign in the context of a convention at which officers are to be elected where access to the floor is limited to delegates. 29 C.F.R. 452.79. The investigation did not reveal that the union discriminated against candidates by making campaigning information available to some but not all candidates. The investigation revealed that, as discussed above, the incumbent slate developed its own campaign strategy and used its own funds to provide hotel key cards and an electronic sign with its campaign slogans on them. Your slate could also have used its funds to campaign in this way. That the incumbent slate did not communicate to your slate how it intended to campaign at the convention does not amount to a violation of the Act.

Also related to convention campaigning opportunities, you alleged that your slate's supporters were told to remove their campaign t-shirts before entering the convention while the incumbent slate's supporters were allowed to wear theirs. The convention rules prohibited the distribution of campaign literature inside the convention hall, but specifically allowed delegates to wear hats, shirts, ties, buttons, or any campaign paraphernalia at any time and place. Witnesses reported seeing supporters of both slates wearing campaign t-shirts. The investigation revealed that you and another MDT candidate reported that a sergeant-at-arms stated that campaign t-shirts were not

permitted in the convention hall.  It further revealed that you went to the union's attorney who told you that such t-shirts were allowed; and another candidate from your slate reported this to the election committee chairman who subsequently told the sergeant-at-arms that t-shirts were allowed.  Accordingly, because the mistake was addressed in a timely manner, there was no violation.

Slate Voting

You alleged that slate voting was permitted in the international officer election in contravention to the OPCMIA constitution.  You alleged that the voting instructions were unclear and that voters may not have understood that they were not required to vote for a whole slate, but could split their votes among the slates.  The constitution does not address slate voting.  The investigation revealed that delegates were instructed in a number of ways how to mark the ballot;  the ballot itself  contained  instructions on the reverse side regarding the way in which votes should be marked and the front side stated, "See reverse side for instructions."  The instructions stated:

> You may vote for a full slate.  To vote for a full slate, fill in the bubble next to the name of the slate of your choice.  If you vote for a full slate, only the slate vote will be counted, and any votes for individual candidates not on that slate will be ignored.  Do not vote for more than one slate.  To vote for candidates individually, completely fill in the bubble next to the names of the candidates of your choice and do not put any marks in any of the bubbles next to the names of slates.

The investigation further established that similar instructions were delivered on the convention floor on August 12, 2014.  The instructions were posted on the door of the polling place, and the election committee chairman stated that he reminded delegates of the instructions when they entered the polling place and offered them copies of the instructions.  Further, while the records review showed that five members indicated both a slate vote and votes for individual candidates, none of the members interviewed stated that he or she was unable to understand how to properly mark the ballot from the instructions given.  Accordingly, there was no violation.

Final Tally

You alleged that the final tally was not announced or reported at the convention.  You alleged further that the tally was read into the record the day after the election, but too rapidly to take notes.  The LMRDA requires adequate safeguards to insure a fair election and requires the voting results for each local labor organization's election to be published.  The investigation revealed that the election committee announced the winners of the election immediately after the tally, but they did not give a full report of

the tally until the following day. Further, the result totals were read into the convention record and were published in the convention proceedings and the final election report. There is no particular rule under the union's constitution or the LMRDA governing the announcement of the election results at the convention; thus, there was no violation

For the reasons set forth above, the Department has concluded that there was no violation of the LMRDA that may have affected the outcome of the election. Accordingly, the office has closed the file regarding this matter.

Sincerely,


Sharon Hanley
Chief, Division of Enforcement

cc: Patrick D. Finley, General President
Operative Plasterers' and Cement Masons' International Association
11720 Beltsville Drive, Suite 700
Beltsville, MD 20705

Christopher B. Wilkinson, Associate Solicitor
Civil Rights and Labor-Management Division