UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                                        :
AMY ARUNDELL, *et al.*,                                  :
                                                        :
                                     Plaintiffs,        :
                                                        :            25-CV-3382 (VSB)
                  - against -                            :
                                                        :          **OPINION & ORDER**
UNITED FEDERATION OF TEACHERS,                          :
                                                        :
                                     Defendant.         :
                                                        :
--------------------------------------------------------X

<u>Appearances</u>:

Arthur Z. Schwartz
Advocates for Justice, Chartered Attorneys
New York, NY
*Counsel for Plaintiffs*

Alan Mark Klinger
David Jonathan Kahne
Dina Kolker
Steptoe LLP
New York, NY
*Counsel for Defendant*

<u>VERNON S. BRODERICK, United States District Judge</u>:

      Before me is Plaintiffs' motion for a preliminary injunction. (Doc. 6.) During the

hearing on May 1, 2025, I issued an oral ruling on Plaintiffs' motion, but indicated that I would

be filing a more detailed, written decision. This Opinion & Order provides additional detail for

my oral decision. For the reasons stated on the record during the May 1, 2025 hearing and

below, Plaintiffs' motion for a preliminary injunction is GRANTED IN PART and DENIED IN

PART.

I.  **Factual Background**[1]

Defendant United Federation of Teachers ("UFT") is a local labor organization under the

Labor-Management Reporting and Disclosure Act (the "LMRDA"), 29 U.S.C. § 1 *et seq.*, and

represents approximately 200,000 New York City employees for collective-bargaining purposes.

(Doc. 4 ("Am. Compl.") ¶ 5.)  Most of these employees are teachers and paraprofessionals.  (*Id.*)

The UFT's office is located at 52 Broadway in Manhattan, New York.  (*Id.*)

Plaintiff A Better Contract Slate ("ABC") is a slate with the UFT and "runs candidates

for office," including those who have previously "been elected to various union offices in the

UFT."  (Am. Compl. ¶ 3.)  ABC is an unincorporated association.  (*Id.*)  Plaintiff Amy Arundell

is a New York City public school teacher and UFT member.  (*Id.* ¶ 4.)  ABC nominated Ms.

Arundell as UFT presidential candidate.  (*Id.* ¶ 3.)

On February 26, 2025, Arthur Goldstein, one of the ABC slate candidates, criticized UFT

President Michael Mulgrew in a newsletter.  (Am. Compl. ¶ 8.)  Goldstein wrote about New

York Governor Kathy Hochul's "30-day state budget bill amendments," which would affect at

least three retirement systems:  the New York City Employees' Retirement System, the New

York City Teachers' Retirement System, and the Board of Education Retirement System, which

collectively cover hundreds of thousands of active and retired employees and hundreds of

billions of dollars in assets.  (*Id.*)  Goldstein suggested that Governor Hochul's bill would "save"

New York City $11 billion through 2032, but that "they will have to pay it all back later."  (*Id.*)

In order to "save" the City this money, the "pensions of retired workers" would suffer.  (*Id.*)

---

[1] The factual background consists of information primarily taken from Plaintiffs' Amended Complaint, (Doc. 4 ("Am. Compl.")), Plaintiffs' motion for preliminary injunction, (Doc. 6), Defendant's opposition brief , (Doc. 13 ("Opp'n")) and the accompanying declarations, (Docs. 14–16), and the parties' representations at the hearing on May 1, 2025.  The factual background here is provided only for the purposes of the instant motion for a preliminary injunction.  It should not be construed as any finding of fact for any other motion.

Goldstein seems to accuse President Mulgrew of supporting this bill, and states that President Mulgrew does not care about the costs because "even if he screws up," he will have "stepped down" by 2032 such that his "successor can deal with all the blowback."  (*Id.*)

On April 16, 2025, President Mulgrew sent an email (the "April 16 Email") to purportedly the "entire UFT NYC employed membership, which is the vast majority of the UFT membership."  (Am. Compl. ¶ 9.)  UFT contends that the email was sent "solely to retirees," which amounts to 48,644 recipients.  (Doc. 13 ("Opp'n") at 8.)  At the May 1, 2025 hearing, Plaintiffs' counsel conceded that the email was sent only to retirees.

The April 16, 2025 email began with a description of President Mulgrew's "trip to speak with [UFT's] Florida retirees on the east and west coasts," and states that the email is to "update you on some issues that are important to retirees and our union."  (Am. Compl. ¶ 9.)[2]  The email then discussed an "intentional misinformation campaign around our pension system" and the UFT's withdrawal of support for Governor Hochul's bill, stating:  "In no instance and under no circumstances was any money slated to be borrowed from our pensions funds – that is illegal." (*Id.*)  UFT described Governor Hochul's bill as, among other things, resulting in "pension smoothing" for city pension systems, including the NYC Teachers Retirement System.  (Opp'n 6.)  The April 16 Email reiterated the UFT's "commitment to traditional Medicare," and stated that the UFT "stand[s] in *full* opposition to anything that seeks to undermine our traditional Medicare."  (Am. Compl. ¶ 9 (emphasis in original).)

The April 16 Email then explained the UFT's reasoning behind not supporting Bill 1096. (Am. Compl. ¶ 9.)  Defendant characterized Bill 1096 as proposed legislation—under

---

[2] Although the April 16 Email was addressed "Dear Arthur," UFT's counsel confirmed at the May 1, 2025 hearing that the software program that was used to distribute the email automatically inserted the first name associated with the email address that had subscribed to this UFT newsletter.  (*See also* Mot. 6 (stating that UFT's emails address members by "their first name").)

consideration by the City Council—which "seek[s] to freeze retiree healthcare." (Opp'n 6.)
Specifically, the April 16 Email stated that Bill 1096 "may look like it seeks to simply protect
our retiree health care," but it actually runs contrary to the "Taylor Law,"[3] which prohibits
legislation from changing the "terms, conditions and benefits of any collective bargaining
agreement, which includes our health care." (Am. Compl. ¶ 9.)

The April 16 Email implored the reader to "ask yourself about the motivations of outside
influences who are not members of the UFT and have never been connected to our union." (Am.
Compl. ¶ 9.) The email referenced the federal government's "attacks against our Social
Security" and efforts to "destroy unions and workers' rights," and that the UFT "will not buckle,
no matter what the federal administration attempts." (*Id.*)

UFT contends that retirees have long been interested in the three topics raised in the April
16 Email: (1) Medicare Advantage compared to traditional Medicare; (2) Bill 1096; and (3)
Governor Hochul's proposed bill. (Opp'n 6.) Indeed, the April 16 Email was "sent as a follow-
up" to President Mulgrew's recent visit of retirees in Florida, where he "was asked questions and
received comments on all of the three topics." (*Id.* at 8; *see also* Doc. 14 ¶¶ 9–14 (declaration of
Victoria Lee, Treasurer of UFT).) Defendant claims that President Mulgrew "typically visits
retirees each year." (Opp'n 8.) UFT also describes how consideration of these three issues have
been "primarily [] stoked by" the New York City Organization of Public Service Retirees
("NYCOPSR"), which comprises retired public employees. (*Id.* at 6.) UFT depicts NYCOPSR
as an outside group because its Board of Directors and Administrative Board do not contain any
UFT retirees, even though some its members are UFT members. (*Id.*)

---

[3] At the May 1, 2025 hearing, the parties confirmed that Taylor Law was a reference to a state statute, the Public
Employees' Fair Employment Act.

On April 16, 2025,[4] after the email was sent, Plaintiff, by counsel, wrote to UFT's General Counsel Beth Norton and principal outside counsel stating that Defendant Arundell, "demands the right to do a similar email with a video."[5]  (Am. Compl. ¶ 11.)  Plaintiffs also attached two cases,[6] and also asked:  "Do you want to litigate this too, or just concede."  (*Id.*)

On April 21, 2025, UFT General Counsel Norton responded by saying that she construed Plaintiffs' email as a "complaint," that "the proper venue for this complaint is the UFT Election Complaint Process," and that any future complaints must be filed and resolved through that process.  (Am. Compl. ¶ 12.)  As of May 1, 2025, the UFT had not granted Plaintiffs' request to have an opportunity to send a "similar email with a video."  (*Id.* ¶ 13.)  Voting ballots were scheduled to be mailed out on May 1, 2025.  (*Id.*)

On Sunday, April 27, 2025, Plaintiff Arundell emailed UFT a request to send "on or before May 2, 2025" three campaign emails:  "1) to the entire membership; 2) to the Child Care division[;] and 3) to the Retiree Division."  (Doc. 22-1 at 1.)

## II.     **Procedural History**

Plaintiffs initiated this action by filing a complaint on April 24, 2025.  (Doc. 1.)  That same day, Plaintiffs filed an amended complaint.  (Doc. 4 ("Am. Compl.").)  Plaintiffs assert two violations of Title IV of the Labor Management Reporting and Disclosure Act of 1959 ("LMRDA"), specifically 29 U.S.C. § 481(c).  (*Id.*)  First, Plaintiffs allege that Defendant

---

[4] The Amended Complaint dates Plaintiffs' communication with UFT General Counsel Beth Norton as "February 16." (Am. Compl. ¶ 11.)  However, Plaintiff Arundell's declaration in support of Plaintiffs' order to show cause states that the communication was sent on "April 16, 2025." (Doc. 22 ¶¶ 2(a), 3(a).)  Accordingly, I presume that the Amended Complaint contained a typographical error, and that the communication was sent on April 16, 2025.

[5] At the May 1, 2025 hearing, Plaintiffs' counsel retracted the request that a video be included in any email distribution.

[6] The communication does not list those two cases, but based upon Plaintiffs' submission I presume the cases were *Guzman v. Loc. 32B-32J, Serv. Emps. Int'l Union, AFL-CIO*, 151 F.3d 86 (2d Cir. 1998), and *New Directions v. Seda*, 867 F. Supp. 242 (S.D.N.Y. 1994).

violated § 481(c) by preventing Plaintiffs the equal opportunity to send an email to UFT

members after incumbent President Michael Mulgrew sent the April 16 Email, which constituted

campaign literature under the law.  (*Id.* ¶ 15.)  Second, Plaintiffs allege that even if the April 16

Email did not constitute campaign literature, Defendant violated § 481(c) by not providing

Plaintiffs with the opportunity to send an email to the UFT membership even after they made

such a request.  (*Id.* ¶ 16.)

 The same day that Plaintiffs initiated this action, Plaintiffs filed a proposed order to show

cause why I should not issue an injunction requiring UFT "to allow Plaintiffs Amy Arundell and

A Better Contract Slate to send out an email, without cost, to all members of the United

Federation of Teachers eligible to vote in the United Federation of Teachers officer election,"

and other relief.  (Doc. 5.)  Because the ballots were scheduled to be mailed out on May 1, 2025,

Plaintiffs requested a hearing for Monday, April 28, 2025.  (Doc. 5-1 at 2.)

 On April 25, 2025, Plaintiffs filed a motion for preliminary injunction, requesting

essentially the same relief—namely, the opportunity for Plaintiff Arundell to send a campaign

email to UFT members.  (Doc. 6 ("Mot.").)  That same day, UFT filed a letter requesting that its

opposition brief be due no earlier than April 30, 2025.  (Doc. 9.)  UFT stated that even though

the ballots will be mailed on May 1, 2025, it will "take several days to arrive" and that the

"members will then have nearly a month during which to vote, with ballots set to be counted on

May 29, 2025."  (*Id.*)  Plaintiffs filed a response letter opposing the request that same day,

arguing that "[n]othing happened" in the "internal complaint processes" as described by UFT's

General Counsel's email to Plaintiff.  (Doc. 10.)  Plaintiffs also accused defense counsel of being

"disingenuous" for requesting until April 30, 2025 when they are a "law firm with 53 attorneys"

who has had Plaintiffs' arguments "in hand for 9 days" since Plaintiffs sent Defendant copies of various cases that Plaintiffs claim support their argument.  (*Id.*)

In response to the request for an order to show cause hearing, by order issued on April 25, 2025, I scheduled a hearing for May 1, 2025, and also set a briefing schedule for the preliminary-injunction motion.  (Doc. 11.)  I noted that "the parties should address, among other things, (1) whether Mr. Michael Mulgrew's email on April 16, 2025 constituted campaign literature that is covered by 29 U.S.C. § 481(c), (2) the administrative procedure for these kinds of complaints, (3) what steps Plaintiff took in that administrative process such that judicial intervention is required at this stage, and (4) the feasibility of delaying Defendant's mailing of the election ballots until this motion is resolved."  (*Id.* at 2.)

On April 29, 2025, Defendant filed an opposition brief, (Doc. 13 ("Opp'n")), and accompanying declarations, (Docs. 14–16.)  On April 30, 2025, Defendant filed a letter stating that UFT had just discovered that Plaintiff Arundell had emailed a request to send campaign emails at the candidate's cost on April 27, 2025, but that it was "trapped in the UFT's spam filters."  (Doc. 20.)  That same day, Plaintiffs filed a reply brief, (Doc. 21), and an accompanying affidavit from Plaintiff Arundell, (Doc. 22 ("Arundell Decl.")).  On May 1, 2025, Plaintiffs filed an amended reply brief which made non-substantive revisions to the reply brief.  (Doc. 23 ("Am. Reply").)

On May 1, 2025, I held a hearing on the instant motion.  At that hearing, I issued an oral decision granting in part and denying in part Plaintiffs' motion for a preliminary injunction.

### III.    <u>Legal Standard</u>

To obtain a preliminary injunction, the movant "must make a clear showing that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the

public interest." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (quoting *Winter v. Nat.*

*Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  "A preliminary injunction is an 'extraordinary'

equitable remedy that is 'never awarded as of right.'"  *Id.* at 345–46 (quoting *Winter*, 555 U.S. at

24).

A movant seeking injunctive relief has a "heavier burden" than a plaintiff who must plead

a "plausible claim necessary to avoid dismissal."  *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d

145, 165 (2d Cir. 2020) (citation omitted).  Indeed, in considering the motion for a preliminary

injunction, I "need not accept as true the well-pleaded allegations in [p]laintiff's complaint."

*Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 469 (S.D.N.Y. 2020)

(internal quotation marks omitted and alteration adopted).  Nor do I need to "accept all of a

plaintiff's assertions on a motion for preliminary injunction as true."  *Burroughs v. Cnty. of*

*Nassau*, No. 13-CV-6784, 2014 WL 2587580, at *8 (E.D.N.Y. June 9, 2014) (citations omitted).

Where a party seeks to "alter, rather than maintain, the status quo," the movant "must

show a 'clear' or 'substantial' likelihood of success."  *Sunward Elecs., Inc. v. McDonald*, 362

F.3d 17, 24 (2d Cir. 2004) (quoting *Tom Doherty Assoc., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27,

34 (2d Cir. 1995)).

## IV.    <u>Discussion</u>

### A.    *Applicable Law*

Section 401(c) of the Labor Management Reporting and Disclosure Act of 1959,

provides in relevant part:

> Every national or international labor organization . . . shall be under a duty . . . to
> comply with all reasonable requests of any candidate to distribute by mail or
> otherwise at the candidate's expense campaign literature in aid of such person's
> candidacy to all members in good standing of such labor organization and to refrain

> from discrimination in favor of or against any candidate with respect to the use of lists of members, and whenever such labor organizations or its officers authorize the distribution by mail or otherwise to members of campaign literature on behalf of any candidate or of the labor organization itself with reference to such election, similar distribution at the request of any other bona fide candidate shall be made by such labor organization and its officers, with equal treatment as to the expense of such distribution.

29 U.S.C. § 481(c).  This section has two parts, both of which Plaintiffs claim were violated by UFT.

The first provision of 29 U.S.C. § 481(c) requires a labor organization "to comply with all reasonable requests of any candidate to distribute by mail or otherwise at the candidate's expense campaign literature in aid of such person's candidacy to all members in good standing of such labor organization and to refrain from discrimination in favor of or against any candidate with respect to the use of lists of members." *Id.*  The Supreme Court identified certain factors relevant to the reasonableness inquiry, including whether the request "caused administrative or financial hardship to the [u]nion" or "discriminated against any other candidate." *Int'l Org. of Masters, Mates & Pilots v. Brown*, 498 U.S. 466, 478 (1991).

The second provision of 29 U.S.C. § 481(c) states:  "[W]henever such labor organizations or its officers authorize the distribution by mail or otherwise to members of campaign literature on behalf of any candidate or of the labor organization itself with reference to such election, similar distribution at the request of any other bona fide candidate shall be made by such labor organization and its officers, with equal treatment as to the expense of such distribution." *Id.*  Courts consider a publication's "overall timing, tone, content and context" to determine whether the publication constituted "campaign literature" under § 481(c).  *Guzman v. Loc. 32B-32J, Serv. Emps. Int'l Union, AFL-CIO*, 151 F.3d 86, 91 (2d Cir. 1998) (quoting *New Directions v. Seda*, 867 F. Supp. 242, 245 (S.D.N.Y. 1994)).

### B.    *Application*

The parties' arguments primarily concern the likelihood of success on the merits under 29 U.S.C. § 481(c).  (Mot. 3–6; Opp'n 10 n.5.)  Regarding the other factors, Plaintiffs argue that the balance of equities tips in their favor, and that denial of the request would result in irreparable harm.  (Mot. 7.)  Defendant does not address either of those factors, and neither party addresses the public-interest factor.

Plaintiffs assert two claims for violation of 29 U.S.C. § 481(c):  (1) UFT allowed President Mulgrew to send an email that constituted campaign literature, but did not allow Amy Arundell the equal opportunity to do so, and (2) UFT prevented Plaintiffs the opportunity to send a campaign email even after they made a reasonable request to do so.  Regarding the first claim related to the distribution of campaign literature at the UFT's expense, because Plaintiffs fail to demonstrate a "'clear' or 'substantial' likelihood of success" on the merits, *Sunward Elecs., Inc.*, 362 F.3d at 24 (citation omitted), even assuming the other factors[7] weigh in Plaintiffs' favor, Plaintiffs' motion for a preliminary injunction is DENIED.  Regarding the second claim involving the distribution of campaign literature at Plaintiffs' expense, because Defendant agrees to distribute the requested email, Plaintiffs' motion for a preliminary injunction is GRANTED.  I set forth the basis for these rulings in turn.

---

[7] I note that courts are split on whether a 29 U.S.C. § 481(c) violation constitutes irreparable harm because the LMRDA explicitly provides for post-election remedies.  *Compare Sheldon v. O'Callaghan*, 335 F. Supp. 325, 328–29 (S.D.N.Y. 1971) (citing 29 U.S.C. § 482(c) regarding post-election remedies), *with Dimondstein v. Am. Postal Workers Union*, 964 F. Supp. 2d 37, 50 (D.D.C. 2013) (finding that post-election complaint was "not an adequate remedy" (internal quotation marks omitted)).  Because I assume the irreparable-harm factor favors Plaintiffs, I do not opine on whether a § 481(c) violation constitutes irreparable harm.

### 1.    The April 16 Email is Not Campaign Literature

The first issue I address is whether President Mulgrew's April 16 Email constituted campaign literature within the meaning of the statute.  Under Section 481(c), a labor organization that authorized the distribution of campaign literature to its members is required to provide a "similar distribution at the request of any other bona fide candidate . . . with equal treatment as to the expense of such distribution."  29 U.S.C. § 481(c).  The parties do not dispute that Plaintiff Amy Arundell is a bona fide candidate in the upcoming UFT elections.[8]

The crux of Plaintiffs' instant motion is that the April 16 Email constituted "campaign literature," and therefore Plaintiffs must be granted an equal opportunity to send a campaign email at the UFT's expense.  Plaintiffs argue that the April 16 Email constituted campaign literature based on its timing, tone, content, and context.  Specifically, the email was sent two weeks before ballots were mailed out, and the tone and content of the email suggests it is campaign literature because it (1) concerned "two hot-button issues in this election:  pensions and" Mulgrew's attempt to put UFT retirees onto Medicare Advantage coverage, and (2) was "responding, using resources" to campaign literature from Defendant ABC.  (Mot. 5, 6.)  In opposition, Defendant emphasizes the fact that the April 16 Email nowhere mentions Plaintiffs, any other candidate, or the election.  (Opp'n 12.)

Accordingly, the issue is whether the April 16 Email constituted "campaign literature" so as to trigger UFT's duty to provide Plaintiffs the opportunity for a similar distribution under § 481(c).  The parties agree that courts should consider a publication's "overall timing, tone,

---

[8] At the May 1, 2025 hearing, I asked whether Defendant ABC, an unincorporated association, has a right of action or standing under 29 U.S.C. § 481(c).  Plaintiffs' counsel pointed out that the court in *New Directions v. Seda*, 867 F. Supp. 242 (S.D.N.Y. 1994) considered but did not opine on whether New Directions, a caucus within the union, was a "bona fide candidate" under § 481(c).  Similarly, for the purposes of this Opinion & Order, I assume without deciding that ABC is a proper plaintiff that can seek relief under § 481(c).

content and context" in resolving this issue.  *Guzman*, 151 F.3d at 91 (internal quotation marks omitted).  As an initial matter, UFT does not dispute that the April 16 Email was sent two weeks prior to ballots being mailed out, and thus was "arguably sent during the election period." (Opp'n 18.)  The timing of the email, therefore, supports the argument that the April 16 Email constitutes campaign literature.  However, UFT argues that the April 16 Email's tone, content and context demonstrate otherwise.

Plaintiffs rely primarily on *New Directions v. Seda*, 867 F. Supp. 242 (S.D.N.Y. 1994), and *Guzman v. Local 32B-32J, Service Employees International Union, AFL-CIO*, 151 F.3d 86 (2d Cir. 1998), as supporting their argument that the April 16 Email constituted campaign literature.  These cases are distinguishable and Plaintiffs' reliance on them is misplaced.  In *New Directions*, the court found that the incumbent's article, which appeared in the union's newsletter, constituted campaign literature because it was distributed shortly before the union election and because the "tone and content of the article are political and smacks of campaigning."  867 F. Supp. at 245.  The challenged article was "conspicuously political" because it labeled the plaintiffs as "political opportunists" who desired rank-and-file members "to get screwed" because of the upcoming contract, noted that the plaintiffs should "[w]ait until the election to electioneer," and "repeatedly referr[ed] to the upcoming elections."  *Id.* at 244–45.  Similarly, in *Guzman*, the court stated that a union publication contained "enough highly favorable coverage of [the incumbent president] to support a finding that the publication was campaign literature."  151 F.3d at 91.  The challenged publication in *Guzman* was "also critical of" the plaintiffs, who were the incumbent president's political opponents.  *Guzman v. Loc. 32B-32J, Serv. Emps. Int'l Union, AFL-CIO*, No. 95-CV-5713, 1995 WL 562187, at *1–2 (S.D.N.Y.

Sept. 21, 1995) (describing the publication's rhetoric of plaintiffs as "crestfallen dissidents" and "frivolous candidates").

The facts here do not mirror either case.  The April 16 Email does not mention either Plaintiff, any election candidate, or the election itself.[9]  This complete omission suggests that the email does not constitute campaign literature.  *See McLaughlin v. Am. Fed'n of Musicians of U.S. & Can., AFL-CIO*, 700 F. Supp. 726, 735 (S.D.N.Y. 1988) (finding publication "crossed the line into impermissible electioneering" where it engaged in "continued direct and indirect personal attacks on" the incumbent candidate).  Indeed, the April 16 Email is similar to the challenged publication in *Smith v. New York Metro Area Postal Union*, No. 12-CV-2002, 2012 WL 1027066 (S.D.N.Y. Mar. 27, 2012).  In that case, the court held that the publication "bears none of the hallmarks of campaign literature that were present in *New Directions* and *Guzman*." *Id.* at *2.  The court noted that the challenged communication was "neither laudatory of the incumbent candidates nor . . . derogatory of any opposition candidate," did not mention the plaintiffs or "any other union members in their capacity as candidates," contained "no pictures of the incumbent candidates" or "any discussion of party platforms," failed to mention the election date, and did not encourage any member to vote.  *Id.*

True, one can argue that the April 16 Email was "political" because of its references to attacks by the federal government on unions and workers' rights.  However, the email was referring to the potential clash between the federal government and UFT—not a clash involving union politics and candidates in an upcoming union election.  The April 16 Email's references to the federal administration only provides background for the important union issues at stake, and

---

[9] The April 16 Email makes one reference to an "election."  (Am. Compl. ¶ 9 ("And, through the retiree election, I heard you all loud and clear that no matter the intent, we must remain committed to traditional Medicare.").) However, the parties agree that this does not reference the upcoming election for union president challenged here. (Opp'n 14 n.7; Arundell Decl. ¶ 5.)

does not categorically render the email campaign literature, especially when it does not connect in any way to the election or any candidate.

The April 16 Email's only reference to President Mulgrew is when he described his experience of  "taking care of [his] aging mother" to emphasize the fact that he cared about the healthcare of retirees.  (Am. Compl. ¶ 9.)  Plaintiffs' reply brief cites several cases in support of their argument that a union publication's "[s]trong praise for an incumbent" renders it campaign literature. (Am. Reply 5–6.)  As with Plaintiffs' reliance on *New Directions* and *Guzman*, Plaintiffs' reliance on these cases is misplaced.  Plaintiffs fail to identify a single part of the April 16 Email that "strongly praised" the incumbent president or "strongly criticized" his opposing candidate, as the court found in *Usery v. International Organization of Masters, Mates & Pilots, International Maritime Division, ILA, AFL-CIO*, 538 F.2d 946, 948 (2d Cir. 1976).  Plaintiffs likewise fail to identify an "excessive coverage, column-wise and pictorially" of President Mulgrew "in relation to the coverage of other matters," as the court found in *Yablonski v. United Mine Workers of America*, 305 F. Supp. 868, 871 (D.D.C.), *supplemented*, 305 F. Supp. 876 (D.D.C. 1969).

I find that the April 16 Email's single reference to President Mulgrew and his mother is not praise of an incumbent which could transform a standard issue-based union publication into campaign literature.  *See Sheldon v. O'Callaghan*, 335 F. Supp. 325, 328 (S.D.N.Y. 1971) (finding publication covering "incumbent candidates in their respective representative capacities as active participants in matters of interest to the membership" with no discussion of active members running for office did not constitute campaign literature); *New Watch-Dog Comm. v. N.Y.C. Taxi Drivers Union, Loc. 3036, AFL-CIO*, 438 F. Supp. 1242, 1251 (S.D.N.Y. 1977) (finding no campaign literature because no "use by the incumbent president of the union paper to

publicize severe criticism of opposing candidates and lavish campaign promises on his own

behalf" or "electioneering for the incumbent candidate (and) ad hominem attacks upon an

opposition candidate" (internal quotation marks omitted)); *see also Camarata v. Int'l Bhd. of*

*Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 478 F. Supp. 321, 330 (D.D.C. 1979)

("So long as such coverage is addressed to the regular functions, policies and activities of such

incumbents as officers involved in matters of interest to the membership, and not as candidates

for re-election, there is no violation of" § 481(c).), *aff'd*, No. 79-2269, 1981 WL 154071 (D.C.

Cir. Jan. 23, 1981).  Nor could there be any derogation of other candidates because none is

named.

     The fact that the April 16 Email was sent only to retirees, and not the entire UFT

membership, further militates against a finding that the email was campaign literature because

the email was sent to a fraction of the union electorate.  At the hearing, Plaintiffs argued that

retirees constitute about 25% of the UFT membership, and therefore the email was campaign

literature sent to a crucial voting bloc.  This argument is an overstatement, and even assuming

that it is true, it is not dispositive.  The distribution of the email is consistent with its content,

which involves issues tailored to retirees; therefore, it makes sense why the email was sent only

to retirees.  In other words, an email sent to retirees, with content centered on issues most

important to those same retirees, suggests a union president's attempts to address specific issues

to a specific group of members, independent from any campaigning efforts.

     Likewise, the tone of the April 16 Email—which Plaintiffs describe as being indicative of

a campaign email—can be explained by its context.  UFT explains that NYCOPSR—an

unaffiliated organization, where no board director is a member of the UFT—has consistently

spread misinformation about Bill 1096 and Governor Hochul's bill and otherwise attacked UFT

"throughout this election season." (Opp'n 6–7, 19.) UFT clarifies that any "emphatically phrased" statements in the April 16 Email should be read in the context of UFT having had to historically and continually "respond to these attacks, to ensure that members are accurately informed about the business of the union." (*Id.* at 18–19.) Arundell confirms that "NYCOPSR is a major supporter of [her] campaign." (Arundell Decl. ¶ 4.) However, the April 16 Email does not ever reference NYCOPSR or Ms. Arundell. Nor does it make any explicit connection between the two.

Plaintiffs' instant motion states that the April 16 Email is addressing alleged misinformation from "campaign literature put out by, and litigation supported by the A Better Contract Slate." (Mot. 5.) Plaintiffs also attempt to characterize the April 16 Email as a response to Arthur Goldstein's critical newsletter. However, Plaintiffs clarified at the May 1, 2025 hearing that the article they cite in the Amended Complaint—the February 26, 2025 article—was just one of many articles that Mr. Goldstein published. Indeed, Plaintiffs acknowledged that Mr. Goldstein's newsletter was created several years ago, predating both this election cycle and the formation of the ABC slate. These concessions further indicate that the April 16 Email was not in response to a specific blogpost or campaign activity, and was instead addressing general issues relevant to union members.

Plaintiffs argue, for the first time in their reply brief, that the April 16 Email was in response to criticism by NYCOPSR. (Am. Reply 2.) As an initial matter, "[i]ssues raised for the first time in a reply brief are generally deemed waived." *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 91 n. 13 (2d Cir. 2010) (citation omitted). In any event, to the extent that the NYCOPSR and Plaintiffs may be closely aligned on certain campaign issues, such alignment

does not preclude UFT from addressing issues that are important to union members that also happen to be campaign issues.

Plaintiffs' strongest argument is that the timing of the April 16 Email renders it campaign literature. However, Plaintiffs take the argument too far, and appear to request a blackout period before an election where an incumbent president is prohibited from speaking about issues that are relevant to both the union members and any candidate's campaign. That is not the law. A publication's proximity to an upcoming election alone is insufficient to render it campaign literature. *See, e.g.*, *Herman v. United Auto., Aerospace, Agric. Implement Workers of Am., AFL-CIO, Loc. 148*, No. CV 00-02578, 2001 WL 34047301, at *2–3 (C.D. Cal. Jan. 10, 2001) (finding that although the publication was made "shortly before the election," the content and tone of the publication "do not indicate an attack on one candidate or support of another"); *Hudson v. Am. Fed'n of Gov't Emps.*, 308 F. Supp. 3d 121, 128–30 (D.D.C. 2018) (finding timing of publication to be non-dispositive). Assuming that the LMRDA seeks to address the "uneven playing field" between incumbent and challenger candidates, Plaintiffs' categorical rule exceeds the scope of § 481(c) and unduly hinders an incumbent president from serving the union membership. Congress could have created such a blackout period prior to the election, during which either (1) union officials were precluded from speaking about election issues or (2) defined such speech to constitute campaign literature. Congress did not do so, and I decline to expand the law.

Moreover, despite Plaintiffs' characterization of the April 16 Email as "a vitriolic expression of [President Mulgrew's] defensive position," (Am. Reply 2), I do not find the email to contain such an aggressive tone. Indeed, President Mulgrew made clear that the purpose of the email was to update and inform the reader on "some issues that are important to retirees and

[the] union," including to address misinformation from "outside influences who are not members of the UFT and have never been connected to our union." (Am. Compl. ¶ 9.)

The April 16 Email also explains that President Mulgrew recently returned from his trip to Florida to visit retirees. (Am. Compl. ¶ 9.) Plaintiffs characterize the visit as "most likely," a "union-financed campaign trip" due to President Mulgrew's "Caucus' major defeat in the recent Retiree Division elections." (Am. Reply 2.) However, UFT claims that these visits occurs every year, (Opp'n 8), independent from any supposed defeats in Retiree Division elections, further indicating that Mr. Mulgrew attended these visits in his capacity as President of UFT and not as a candidate for any election. Plaintiffs do not rebut, either in their papers or in their argument during the hearing, the assertion that these visits were annual.

Plaintiffs also condemn the April 16 Email itself as campaign literature in light of the context that President Mulgrew supposedly suffered a "loss in the recent Retiree Division election." (Am. Reply 4.) However, the April 16 Email indicates that President Mulgrew heard his constituents "loud and clear" and that he was "grateful for all of [their] voices." (Am. Compl. ¶ 9.) This can be interpreted as the opposite of campaign material doubling down on a candidate's original platform; it can potentially show a union president listening to his constituents and changing his priorities in light of election results that signal his constituents' values and perspectives. In short, it is not clear that the relevant context suggests that the April 16 Email was campaign speech. The context further indicates that the April 16 Email was not an electioneering publication, but was instead communication to UFT retirees to address their concerns about healthcare, pension benefits, and more.

A communication does not constitute campaign literature "every time an incumbent candidate speaks to union members." *Hudson*, 308 F. Supp. 3d at 128. Rather, the issue is

"whether the totality of the circumstances establish that the publication exceeded the bounds of permissible reportage on union matters that is an unavoidable consequence of performing the duties of elected office." *Id.* (internal quotation marks omitted). It cannot be the case that a union communication addressing issues more generally, without any reference to a specific candidate or slate, categorically constitutes campaign literature to trigger § 481(c) duties for the union. Here, the April 16 Email was in response primarily to retirees' concerns about three issues, one of which predated the current election cycle. Indeed, the issue of Medicare Advantage long predated the upcoming election, "including since prior to the last UFT election in 2022." (Opp'n 6.) The definition of "campaign literature" is not so expansive as to cover an email from a union president who seeks to engage union members—here, retirees—about issues that are important to them, even if those may be "hot-button" issues. *See Dole v. Fed'n of Postal Police Officers, Inc.*, 744 F. Supp. 413, 418 (E.D.N.Y. 1990) ("[U]nion-financed publication may cover factual notices or statements of interest to the members." (internal quotation marks omitted)).

In sum, the tone, content, and context of the April 16 Email demonstrate that it did not constitute campaign literature. Plaintiffs accordingly fail to establish a likelihood of success on the merits. Because the April 16 Email was not campaign literature, there is "no basis in law or fact for" granting Plaintiffs' request for a preliminary injunction. *Smith*, 2012 WL 1027066, at *2.

### 2. Plaintiffs Did Not Make a Reasonable Request to Send a Campaign Email

Under a different provision of the statute, certain labor organizations are "under a duty . . . to comply with all reasonable requests of any candidate" to distribute campaign literature "at the candidate's expense." 29 U.S.C. § 481(c). The Supreme Court identified certain factors

relevant to the reasonableness inquiry, including whether the candidate's request "caused administrative or financial hardship to the [u]nion" or "discriminated against any other candidate." *Int'l Org. of Masters, Mates & Pilots v. Brown*, 498 U.S. 466, 478 (1991).

At the May 1, 2025 hearing, the parties agreed that Arundell's email sent on April 27, 2025 constituted a request from both Plaintiffs to send a campaign email at Plaintiffs' expense. UFT represented that they would process the request and notify Plaintiffs, as well as the other slates, of the potential costs and other details about a potential email distribution. UFT did not argue that the administrative burdens were too high; UFT was simply going through the proper procedures to process such a request, including to provide a breakdown of costs for Plaintiffs and the other slates. Nor did UFT argue that the request discriminates against any other candidate or slate. *Brown*, 498 U.S. at 478. UFT clarified that even if the other slates did not want to send campaign emails at their own expense, Plaintiffs were entitled to do so.

In large part based upon Defendant's agreement to process Arundell's April 27, 2025 request, I find that the request was reasonable. In issuing my oral decision at the May 1, 2025 hearing, I ordered that (1) Defendant provide Plaintiffs, by May 2, 2025 at 10 a.m., the breakdown of costs and other logistical information regarding Plaintiffs' request, (2) Plaintiffs provide Defendant, by May 2, 2025 at 12 p.m., the campaign email that Plaintiffs request be sent, and (3) Defendant send out that campaign email to the appropriate parties by May 7, 2025. I also notified the parties that the oral decision was without prejudice to either side raising issues deemed to be inconsistent with the ruling. To date, neither party has raised any issues regarding Plaintiffs' claims or my oral decision.

V.    <u>**Conclusion**</u>

Plaintiffs assert two claims based on different parts of 29 U.S.C. § 481(c).  Regarding the first claim involving the distribution of campaign literature at the UFT's expense, because Plaintiffs fail to demonstrate a clear or substantial likelihood of success on the merits, Plaintiffs' motion for a preliminary injunction is DENIED.  Regarding the second claim involving the distribution of campaign literature at Plaintiffs' expense, because Defendant agrees to distribute the requested email, Plaintiffs' motion for a preliminary injunction is GRANTED.

The Clerk of Court is respectfully directed to terminate Documents 6 (motion for preliminary injunction) and 10 (letter motion for oral argument).

SO ORDERED.

Dated: May 8, 2025
      New York, New York

Vernon S. Broderick
United States District Judge